RYAN, Circuit Judge.
 

 Appellants are the Securities Investor Protection Corporation (SIPC) and the trustee in bankruptcy (the trustee) of the Toledo, Ohio, brokerage firm of Bell & Beckwith (the debtor). Appellees are a couple, the Murrays, who were customers of the debtor. The sole issue in the case is whether the district court correctly affirmed a bankruptcy court determination that the Murrays had a claim against the bankruptcy estate for stock shares rather than cash. If the Murrays’ claim is for cash, they will receive significantly less than the shares are now worth.
 

 We conclude that the Murrays have a claim for cash rather than stock and therefore reverse.
 

 I
 

 The bankruptcy court granted the Mur-rays’ motion for summary judgment on stipulated facts. The sequence of events, insofar as agreed upon, is as follows:
 

 (1) On February 4, 1983:
 

 (a) the Murrays had an account with the debtor;
 

 (b) that account reflected, among other things, their ownership of 3500 shares of Toledo Trustcorp stock registered in the debtor’s street name;
 

 (c) the Murrays instructed the debtor to sell all 3500 shares;
 

 (d) the debtor arranged to sell 1900 shares to other brokers who all were buying on their own accounts as principals (not for customers);
 

 (e) the debtor engaged to buy the remaining 1600 shares for its own account; and
 

 (f) all of these sales were reflected on trade tickets and reported to the Mur-rays;
 

 (2) On February 5, 1983 (the
 
 “filing date”),
 
 the debtor brokerage firm filed bankruptcy proceedings;
 

 (3) In a statement issued to the Murrays by the debtor, and reflecting transactions “as of 02/04/83,” the debtor listed all of the foregoing transactions, and under the heading “DATE” was printed “02/11/83.” This statement thus reflected the key facts that the
 
 “trade date”
 
 for these transactions was February 4 and the anticipated
 
 “settlement date
 
 ” was February 11. The importance of these dates derives from the fact that the first of them is before the filing date, and the second is after it;
 

 (4) On February 10, 1986, the district court issued a protective order; and
 

 (5) The trustee then acted to preserve what he considered to be the status quo; he “cancelled” the transactions insofar as they involved the broker/purchasers, leav
 
 *335
 
 ing them to cover by purchasing stock elsewhere and submitting a claim to the estate for any deficiency; he retained all 3500 shares of stock in the estate; and he credited the Murrays’ account for the sale prices agreed upon.
 

 II
 

 The Securities Investor Protection Act (SIPA) is, as the title suggests, legislation intended:
 

 “to protect individual investors from financial hardship, to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.”
 

 S.R. No. 91-1218, 91st Cong., 2d Sess. 4 (1970) (“Senate Report”);
 
 see also
 
 H.R. No. 91-1613, 91st Cong., 2d Sess. 1 (1970), U.S. Code Cong. & Admin.News 1970, p. 5254 (“House Report”);
 
 SIPC v. Barbour,
 
 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).
 

 SIPA created SIPC and established procedures for liquidating financially troubled broker-dealers who are members of SIPC. SIPA requires SIPC to establish a fund, by an assessment upon its members, from which claims are paid to customers who have suffered losses as a result of the financial collapse of the broker-dealer. Should SIPC funds become inadequate because of the size or amount of claims, SIPA authorizes a borrowing against the United States Treasury of up to one billion dollars. Under the heading “Payments to customers,” SIPA provides:
 

 “After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debt- or to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of sub-section (d) of this section and section 78fff-3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.”
 

 15 U.S.C. § 78fff-2(b) (1981). Although SIPA differentiates in various ways between the protection afforded stock as opposed to cash claims,
 
 see
 
 15 U.S.C. § 78fff-3 (1981), those differences are not pertinent here.
 

 The parties agree that, when a claimant under SIPA has a claim for stock, that claimant is entitled to stock, rather than cash. Partly because the stock at issue here is now more valuable than at its 1983 sale price, the Murrays want their claim to be characterized as one for stock. The parties also agree that a customer’s claim against a bankrupt broker is based on the customer’s “net equity” on the debtor’s books on the filing date. The parties disagree, however, about how to distinguish cash claims from stock claims when the filing date intervenes between the trade date and the settlement date.
 

 The Murrays and the courts below sought to resolve this issue, which § 78fff-2(b) does not address, by reference to a nearby provision of the statute, § 78fff-2(e), entitled “Closeouts.” This provision states:
 

 “(1) In general. — Any contract of the debtor for the purchase or sale of securities in the ordinary course of its business with other brokers or dealers which is wholly executory on the filing date shall not be completed by the trustee, except to the extent permitted by SIPC rule.”
 

 Another term that requires definition in order to understand this case is: “open contractual commitment.” The SIPC rules, insofar as pertinent, define an “open contractual commitment” as
 

 “a contractual commitment of the debtor, made in the ordinary course of business, to deliver securities to another broker or dealer against receipt from such broker or dealer of the contract price in cash: Provided, That the respective obligations of the parties remained outstanding until
 

 
 *336
 
 the close of business on the filing date.... [and] which ... had a settlement date which occurs on or within five business days subsequent to the filing date....”
 

 17 C.F.R. § 300.300(b) & (c) (1986). The contractual commitments of the debtor to the various broker/purchasers in the Murray transactions fit this definition. The rule applicable to open contractual commitments is that they “shall be closed out or completed” if the broker dealing with .the debtor was doing so not as a principal but on behalf of a customer. 17 C.F.R. § 300.-301 (1986). None of the open contractual commitments in this case falls within this rule.
 

 The courts below reasoned that, because the transactions here do not fall within Rule 301, they are contracts not “permitted by SIPC rule,” and that if these contracts may properly be characterized as “wholly executory on the filing date,” they are contracts which “shall not be completed by the trustee.” § 78fff-2(e)(l). Finally, if the contracts are not completed, there has been no sale, and the Murrays are entitled to have their stocks returned to them.
 

 The dispositive issue thus becomes whether this contract should be characterized as “wholly executory.” The bankruptcy court determined that it should. This outcome is reached by reference to general contract and agency principles. The bankruptcy court cites one of its own opinions,
 
 In re 2522 South Reynolds Corp.,
 
 33 B.R. 616, 617 (Bankr.N.D.Ohio 1983), for the principle that an executory contract, for purposes of bankruptcy, is “an agreement under which the obligations of both parties are so far unperformed that the failure of either to complete performance would constitute a material breach” of the contract.
 
 See also In re Knutson,
 
 516 F.2d 916 (8th Cir.1977); 4A
 
 Collier on Bankruptcy
 
 § 70.43[2] (14th ed. 1975). In other words, the court looked to see if this was a situation in which neither side had yet performed, and determined that it was. In the court’s view, (1) the sellers had not performed before the filing date, because the purchasers had not yet received the stock certificates — and in fact never did receive them — and (2) the purchasers had not performed before the filing date, because they never paid the Murrays for the stocks.
 

 This latter point is the one that the stipulated facts leave most subject to interpretation. On February 4, the debtor credited the Murrays’ account with the proceeds of the sale, but with the notation that the credit actually was to take effect on the settlement date, February 11. After the trustee took charge of the debtor’s affairs, this amount was credited to the account, but it still was in the nature of an advance by the debtor on behalf of (or in lieu of payment by) the purchasers. The bankruptcy court decided, and the district court agreed, that the Murrays never received the price, and the contract was therefore unperformed on both sides.
 

 The bankruptcy court fortified this conclusion with the observation that: “The underlying nature of the customer-broker relationship is that of principal-agent rather than as independently contracting parties.” 47 B.R. 528 (Bankr.N.D.Ohio 1985). Because the debtor cannot be viewed as a contracting party in its own right, the court reasoned, it is only the actions of the Mur-rays and the purchasing brokers that are pertinent here. Thus, it cannot be, for example, that the Murrays delivered the stocks if the stocks never left the control of the Murrays’ agent, the debtor. Nor can it be that the Murrays received payment if the credit in their account was simply an advance paid by the same agent.
 

 In a nutshell, the decision below was that the Murrays are entitled to their stock because it was never sold, and it was never sold because, first, it had not been sold before the filing date, and second, the trustee had no authority, under SIPA, to complete the transaction after the filing date.
 

 Ill
 

 Appellants’ theory is that the “closeout” provision in SIPA, with its “wholly exec-utory” contract language and its appended rules, describes only the mechanism for resolving incomplete contracts between
 
 *337
 
 debtor-brokers and other brokers. They contend that the closeout provision makes no reference to relations between the debt- or and its customers because it is presumed that all trades arranged before the filing date will be treated under SIPA
 
 as if
 
 completed subsequently, regardless of whether they actually are completed. In other words, the status of a customer’s account with a debtor in a case such as this one is fixed on the trade date, not the settlement date. Therefore, the Murrays lost any claim to the Toledo Trustcorp stock on February 4, 1983, and now have only a claim for the purchase price as arranged on that day and subsequently credited to their account.
 

 This theory thus has two aspects. One is statutory, and says that the closeout provision does not condition relations between debtor and customer. The other looks outside the statute, to cases interpreting it and to the state law governing securities transactions, and says that a sale of securities is complete, from the customer’s perspective, on the trade date, and from then on the customer’s claim is for cash, not stock. The settlement date is thus irrelevant under SIPA.
 

 Both sides in this case refer to state or “general” law to supplement SIPA’s provisions on the rights of the customers of brokers. The appellees (and the courts below) made use of contract and agency principles. The appellants refer us to Article 8 of the Uniform Commercial Code, as enacted in Ohio, Ohio Rev.Code Ann. §§ 1308.-01-.44 (Anderson 1985 Supp.).
 

 Of these competing approaches, we consider the latter the more sensible. If we must rely upon some supplemental law, the U.C.C. is the place to look for it, both because the U.C.C. is the law in Ohio (and virtually every other state) governing transactions of this nature (except insofar as federal bankruptcy or securities law preempts it) and because Article 8 of the U.C.C., unlike general contract or agency law, provides specific rules applicable to securities transactions.
 

 Appellants contend that the U.C.C. establishes that the Murrays performed their contractual duty on February 4, by delivering the stock. U.C.C. 8-301, Ohio Rev. Code Ann. § 1308.16 (Anderson 1985 Supp.) provides in part:
 

 “(A) Upon transfer of a security to a purchaser as provided in section 1308.28 of the Revised Code, the purchaser acquires the rights in the security which his transferor had....”
 

 U.C.C. 8-313, Ohio Rev.Code Ann. § 1308.-28 (Anderson 1985 Supp.) provides in part:
 

 “(B) The purchaser is the owner of a security held for him by a financial intermediary
 

 * * * * * *
 

 “(A) ....
 

 “(4) At the time a financial intermediary ... sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser ...
 

 “(b) A quantity of securities that constitute or are part of a fungible bulk of certificated securities in the financial intermediary’s possession or of uncertifi-cated securities registered in the name of the financial intermediary....”
 

 A broker is a “financial intermediary” under this section. U.C.C. 8-314, Ohio Rev. Code Ann. § 1308.29 (Anderson 1985 Supp.), provides in part:
 

 “(A) Unless otherwise agreed, if a sale of a security is made on an exchange or otherwise through brokers:
 

 “(1) The selling customer fulfills his duty to transfer at the time he:
 

 “(a) Places a certificated security in the possession of the selling broker....”
 

 Appellants do not cite or discuss 8-313, instead contending that 8-301 and 8-314 suffice to establish that the Murrays delivered the stocks by placing them in the possession of a broker and ordering that broker to sell them. Once the purchasers arranged the sale with the selling broker, the stocks were delivered — at least as far as the Murrays’ rights and obligations are concerned. They could not reclaim them after this point.
 

 Of course, 8-301 requires that the conditions for a transfer under 8-313 be satis
 
 *338
 
 fied before a transfer is accomplished and the purchaser acquires the seller's rights. The stipulated facts do not include any explanation of whether, on February 4, the debtor sent confirmation of the sales to the purchasers and identified, in its books, certain quantities of the Toledo Trustcorp stock as belonging to those purchasers. If some such procedure was followed, the trustee would presumably have little trouble demonstrating that it was, but no proof along these lines was before the court below. All that is known is that the trustee eventually “cancelled” these sales without having physically delivered the certificates. This leaves the U.C.C. argument somewhat up in the air.
 

 Nonetheless, the reference to the U.C.C. is still helpful. We are concerned here with a transaction that was interrupted by the operation of federal law. Such a transaction must ultimately be defined as a matter of federal law, because SIPA alters the rights of the parties in a way not contemplated by the U.C.C. State law is thus useful not as a dispositive authority but for the legal context it supplies. That legal context clearly is one in which the rights of parties to a sale of securities tend to be fixed — that is, the transfer of legal rights in the securities is accomplished — while the securities are still in the possession of the selling broker. Whatever might be suggested by reference to contract or agency law, securities law does not require that certificates actually change hands before the seller has lost all ownership rights to the purchaser. Thus, the reference to Article 8 of the U.C.C. tends to support appellants’ argument that the trade date, rather than the settlement date, fixes the rights of the parties to a transaction that is interrupted by a bankruptcy filing under SIPA.
 

 IV
 

 In the absence of a clear statutory resolution of this issue, however, our recourse must be principally to such indications of legislative intent as are available to us, rather than to related state and common law principles. In
 
 SEC v. Aberdeen Securities Co.,
 
 480 F.2d 1121 (3d Cir.),
 
 cert. denied,
 
 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973), the court construed the original 1970 version of SIPA (the original act) as providing that:
 

 “If the order by a customer for the purchase or sale of a specific security has been placed by the debtor with another broker and remains uncompleted on the filing date, then the Trustee is
 
 required to complete the transaction.”
 

 Id.
 
 at 1126 (emphasis added). Thus, under the original act, the present issue could not have arisen, because the Murrays’ order for the sale, placed with the debtor before the filing date, would necessarily have been completed by the trustee after the filing date. The concern of the drafters was in part to assure customers that their rights in the debtor’s estate would be fixed and easily discoverable as of the filing date. The original act thus provided for the “completion of interbroker or interdealer transactions only when the interest of a customer
 
 on either side
 
 was involved.”
 
 Id.
 
 (emphasis added).
 

 The current law, enacted in 1978, no longer requires all transactions in which a customer has an interest to be
 
 completed.
 
 Rather, as we have discussed above, the statute, § 78fff-2(e)(l), and accompanying rules, 17 C.F.R. §§ 300.300
 
 et seq.,
 
 require such transactions to be completed
 
 or closed out.
 
 This means essentially that brokers are permitted to cover, by buying stock elsewhere, rather than required to complete transactions.
 

 The current statute does not explain what is to be done with transactions, such as the one here, in which a customer of the debtor, rather than a customer of a broker who dealt with the debtor, has an interest. The closeout provisions are addressed only to contractual commitments between the debtor and
 
 other brokers,
 
 and the appended rules make completion of the transaction turn on whether a customer
 
 of the other broker
 
 has an interest in the transaction. All of the transactions in this case involved brokers buying for their own account. There is no question that such transactions cannot be completed by the trustee.
 

 
 *339
 
 The Murrays contend that all uncompleted transactions must be treated as if no sale order had ever been given. Appellants, however, suggest that, because a customer has an interest in this transaction, and in view of the fact that it cannot be completed, it must be closed out. This would mean that the debtor is required to credit the Murrays with the purchase price while the stocks themselves stay in the debtor’s estate, and the brokers who arranged to purchase those stocks must cover by buying stock elsewhere. Because the other brokers were acting on their own account, they may submit a claim against the estate for any deficiency, but must do so only as general creditors to whom SIPA extends no special protection.
 

 The language of the closeout provision, as well as this historical context, makes it clear that its purpose is to protect customers of brokers who dealt with the debtor. These customers are to be insulated, as much as possible, from the repercussions of the debtor’s financial collapse. The best way to do this is to allow the deals they arranged prior to the filing date to be completed as arranged, or at least to be closed out in such a way as to preserve, for those customers, the benefits of the bargains they made.
 

 We are persuaded that Congress intended the exact same policy to apply to the customers of the debtor as applies to customers of brokers who dealt with the debt- or. They should remain, as much as possible, unaffected by their broker’s collapse. The best way to do this is either to complete trades ordered before the filing date or to settle out with the customers as if those trades had been completed. SIPA does not provide for any trades actually to be completed unless the customer of another broker is involved, and, even then, the closeout alternative is available. Thus, the sensible approach is to close out, rather than to rescind, transactions arranged by the debtor’s customers prior to the filing date, just as the trustee did here.
 

 To the extent that nonstatutory authorities are pertinent, they support this approach. For example, the SEC Commissioner, testifying on the 1978 amendments, expressed the view that: “When a customer sells securities, his claim from that time until settlement and delivery of the funds is a claim for cash.” Hearings Before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 233 (1977).
 

 Appellants also have cited cases which they assert are consistent with their view. None of these cases is precisely on point, and none operates as authority in this court, but the case of
 
 SIPC: SEC v. Morgan, Kennedy & Co.,
 
 3 Bankr.Ct.Dec. (CCH) 15 (Bankr.S.D.N.Y.1977), decided before the 1978 amendments, is very similar.
 
 Morgan, Kennedy
 
 held that the status of a customer’s claim against a debtor-broker was fixed on the trade date, even though no delivery of securities took place before (or after) the filing date. Some other roughly analogous cases tend to adopt similar reasoning, and are to that extent persuasive.
 
 E.g. Tepper v. Chichester,
 
 285 F.2d 309 (9th Cir.1960);
 
 In re GIC Government Securities,
 
 64 B.R. 161 (Bankr.M.D.Fla.1986);
 
 In re June S. Jones,
 
 52 B.R. 810 (D.Ore.1985).
 

 Of course, it may turn out that the customer would have been better off without the “benefit” of his bargain, where, as here, the bargain turns out poorly. But the facts of this case should not be permitted to obscure the overall policy objectives of SIPA. The approach adopted by the courts below will not be, on average, any more beneficial financially to customers of a debtor-broker than the approach the appellants argue for. What would be sacrificed to help out the Murrays is the predictability of knowing that a customer’s trades will always be treated as if completed. The course adopted by the courts below would mean that, until the trustee discovered which purchasing brokers had acted on behalf of customers, the trustee could not know whether the trades should be given effect or not. In this case, the debtor’s records did not contain this information, and letters had to be written to all the purchasing brokers to discover it. We decline to mandate such an inconvenient and unproductive procedure.
 

 
 *340
 
 The courts below acted as if the trustee had no authority to complete the trades, and therefore was required to rescind them. Clearly, however, there is a third possibility here — the trades can be closed out and treated, as regards the customer, as if completed. As for the stocks sold to the debtor itself, this transaction may be treated as complete on the day it was arranged, because the customer’s account was credited and the debtor already had possession of the stock certificates.
 

 V
 

 We hold that, under SIPA, all trades ordered by customers of a debtor before the filing date should be treated, vis-a-vis those customers, as if subsequently completed by the debtor. Those customers who ordered stocks held for them by the debtor to be sold before the filing date have a claim against the estate for the purchase price, not for stock, without regard to whether a “settlement'date” postdating the filing date was arranged.
 

 We reverse the district court’s judgment that the Murrays have a claim for Toledo Trustcorp stock and remand to the district court for entry of judgment in favor of the trustee.