### In re INVESTORS CENTER, INC., Debtor.

### Bankruptcy No. 089–0017–21.

United States Bankruptcy Court, E.D. New York.

June 11, 1991.

---

Irving H. Picard, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wien, New York City, Trustee.

Stephen P. Harbeck, Sr. Associate General Counsel, Securities Investor Protection Corp., Washington, D.C.

John P. Colangelo, Fabricant, Yeskoo & Colangelo, New York City, for claimant Frank Felix.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court are objections by a number of customers of Investors Center, Inc. ("Investors Center" or "ICI") to the determinations made by Irving H. Picard, Esq. as Trustee for the liquidation of the business of Investors Center pursuant to the Securities Investor Protection Act of 1970, as amended (15 U.S.C. §§ 78aaa, et. seq.) ("SIPA").[1] Also before the Court are motions by the Trustee to confirm his determinations.

The critical facts as to each of the objecting customers, or claimants, are virtually the same. In each case the claimant received a written confirmation, dated February 22, 1989, from Wall Street Clearing Company ("Wall Street"), the clearing agency for Investors Center, that certain stock belonging to the claimant had been sold. In each case the Trustee has, nevertheless, held that each claimant only has a "claim for securities" not a "claim for cash" under SIPC Rule 500, 17 C.F.R. § 300.500–300.503. The securities are either worthless, or nearly worthless, and each claimant is asking that his claim be recognized as one for cash in the amount of the confirmed sale. Some claimants also placed sell orders for which they never received written confirmation and which

---

1. Unless otherwise identified, all section references are to Volume 15 of the United States Code.

they also want to have recognized as entitling them to cash.

Insofar as each claimant has a written confirmation of sale, the Court is sustaining his objection to the Trustee's determination and denying the Trustee's motion to confirm that determination. The Court deems this result compelled by Rule 501(a)(1) of the Rules adopted by the Securities Investment Protection Corporation ("SIPC") in March 1988. 17 CFR §§ 300.-501(a)(1). SIPC's rules lay down a "bright line" for determining in a liquidation proceeding whether a securities transaction gives rise to a "claim for cash" or a "claim for securities." Under those rules each of the objecting claimants, because of the receipt of written confirmation of a sale prior to the filing of SIPC's application to liquidate Investors Center, has a claim for cash and not for securities and the Trustee's determination otherwise is incorrect.

## I

SIPA was passed by Congress in 1970 after a wave of brokerage house failures in the late 1970's. It was extensively amended in 1978. In *SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), the Supreme Court explained SIPA's origins as follows:

> Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted SIPA to arrest this process, restore investor confidence in the capital markets, and to upgrade the financial responsibility requirements for registered brokers and dealers.

421 U.S. at 415, 95 S.Ct. at 1736

*See also, In re Bell & Beckwith*, 821 F.2d 333, 335 (6th Cir.1987); *In re Brentwood*

*Securities, Inc.*, 925 F.2d 325, 326–327 (9th Cir.1991).

The Senate Report which accompanied the legislation explained its purposes as follows:

> ... to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

S.Rep. No. 1218, 91st Cong., 2d Sess., 4 (1970); *see also*, H.R.Rep. No. 1613, 91st Cong., 2d Sess. 2 (1970).

■ Broadly speaking, SIPA is designed to accomplish two things. One is to prevent and detect broker-dealers' insolvency through financial controls and oversight. In furtherance of this objective, the Securities and Exchange Commission ("SEC" or "Commission") is given power to establish financial responsibility rules for brokers and dealers and to impose on the self-regulatory organizations requirements for the financial examination of their members. One of the self-regulatory organizations is the National Association of Securities Dealers ("NASD"). Two, SIPA protects the customers of brokers and dealers if insolvency occurs. Through the Securities Investment Protection Corp. (SIPC), a non-profit organization composed of most registered brokers and dealers, investors who deposit cash or securities with a broker are intended to be insured against the risk of broker insolvency. SIPC maintains a fund for such investor protection supported by mandatory assessments against its members based on their gross revenues (§ 78ddd), out of which it makes payments up to certain limits to investors who have deposited cash or securities with a failed broker-dealer (§ 78fff-3(a). If SIPC's funds should be inadequate to carry out its purposes SIPA authorizes a loan of up to one billion dollars from the United States Treasury (§§ 78ddd(f), (g) and (h)).

SIPC has no authority to examine its members. It depends for its information on the self-regulatory organizations and the Commission. If the Commission or any self-regulatory organization believes that a broker or dealer subject to its regulation is in, or is approaching, financial difficulty, it must immediately notify SIPC. (§ 78eee(a)(1)). If SIPC determines that a member has failed or is in danger of failing to meet its obligations to customers and that one or more of certain statutory conditions exist, it may apply to the appropriate federal district court for a "protective decree," adjudicating that the customers of such member are in need of the protection provided by SIPA. (§ 78eee(a)(3); § 78*lll* (13)). This initiates a liquidation proceeding similar to, but not identical with, a bankruptcy proceeding. (§ 78eee(a)(3); 78*lll* (13)).

The purposes of a liquidation proceeding are: (1) to deliver to the debtor's customers the securities to which they are entitled and (2) to "satisfy net equity claims of customers." (78fff(a)(1)).

SIPA calls for the appointment in a liquidation proceeding of a trustee with the same rights and powers as a trustee in bankruptcy. (§ 78eee(b)(3); § 78fff-1(a)). He is to promptly discharge "all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer insofar as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee." (§ 78fff-2(b)).[2]

The filing of an application by SIPC gives the court with which it is filed exclusive jurisdiction of all of the property of the firm involved and of any suit against the trustee with respect to the resulting liquidation proceeding. (§ 78eee(b)(2)(A)). It confers upon the court "the jurisdiction, powers and duties conferred upon a court of the United States having jurisdiction over cases under title 11." (§ 78eee(b)(2)(A)(iii)). The court with which the application is filed is instructed to remove the liquidation proceeding to the bankruptcy court (§ 78eee(b)(4)) which shall conduct the proceeding as though it were being conducted under Chapters 1, 3 and 5 and Subchapters I, II of Chapter 7 of Title 11 (§ 78fff(b)).

## II

In 1988 SIPC, pursuant to its rulemaking authority, promulgated the following rules respecting when a customer is entitled to cash in a liquidation proceeding and when he is entitled to securities:

17 C.F.R. § 300.500—General

These rules will be applied in determining whether a securities transaction gives rise to a "claim for cash" or a "claim for securities" on the filing date of either a liquidation proceeding pursuant to the Securities Investor Protection Act (hereinafter referred to as "the Act") or a direct payment procedure pursuant to section 10 of the Act.

17 C.F.R. § 300.501—Claim for Cash

(1) with respect to net equity claims, authorize the trustee to satisfy claims out of moneys made available to the trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the debtor available to satisfy such claims; and

(2) with respect to claims relating to, or net equities based upon, securities of a class and series of an issuer which are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee, authorize the trustee to deliver securities of such class and series if and to the extent available to satisfy such claims in whole or in part....

---

**2.** Insofar as relevant, 78fff-2(b) reads:

After receipt of a written statement of claim ... the trustee shall promptly discharge ... all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer ... insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date. For purposes of this subsection, the court shall, among other things—

(a) Where a SIPC member ("Debtor") held securities in an account for a customer, the customer has a "claim for cash" with respect to any authorized securities sale:

(1) if the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or

(2) whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

(b) Where the Debtor held cash in an account for a customer, the customer has a "claim for cash," notwithstanding the fact that the customer has ordered securities purchased for the account, unless:

(1) the debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or

(2) whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for purchase for or sale to the account.

17 C.F.R. § 300.502—Claim for Securities

(a) Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:

(1) if the Debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or

(2) whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

(b) Where the Debtor held securities in an account for a customer, the customer has a "claim for securities," notwith-

standing the fact that the customer has ordered the securities sold for the account, unless:

(1) the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or

(2) whether or not written confirmation of the purchase has been sent, if the securities in question have become the subject of completed or executory contract for sale for or purchase from the account.

17 C.F.R. § 300.503—Voidable Securities Transactions

(a) Nothing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law.

(b) Nothing in these Series 500 Rules shall be construed as limiting the right of the Securities Investor Protection Corporation, in a direct payment procedure under section 10 of the Act, to reject a claim for cash or a claim for securities if such claim arose out of a securities transaction which could have been avoided in a liquidation proceeding under the Act.

### III

Investors Center was a broker dealer specializing in penny stocks. Penny stocks are low priced securities which trade in the over-the-counter market and generally sell for as little as a few cents a share. Investors Center was a member of NASD since 1984. Most of its income came from selling speculative securities on its own account to investors. Just before it closed its door it was making the market in fifty NSDAQ issues and twenty low-priced speculative securities. Among them were all the stocks here involved: All Quotes, Inc. ("All Quotes"); Minimatic Implant Technology, Inc. ("Minimatic"); Yardley Ventures, Inc. ("Yardley"); Zephyr Associates, Inc. ("Zephyr"); KBF Pollution Management,

Inc. ("KBF"); and Affiliated National, Inc. ("Affiliated"). The market for these stocks and the prices quoted for them were controlled by Investors Center.

Its business was extensive. Some idea of its scope of the operations is shown by the fact that the Trustee received authorization to publish notice of the commencement of the liquidation proceeding in the Wall Street Journal (National Edition), New York Newsday, the New York Daily News, The Tampa (FL) Tribune, Miami (FL) Herald, the Newark (NJ) Star Ledger, Philadelphia (PA) Inquirer, the Hartford (CT) Courant, the Atlanta (GA) Constitution & Journal, Dallas (TX) Morning News, Denver (CO) Post, Detroit (MI) Free Press, Kansas City (KS) Kansan. (Submission of Affidavits of Publication by Irving H. Picard, April 14, 1989, Docket No. 10).

In December 1988 Investors Center employed 636 registered representatives and held 35,000 customer accounts, of which approximately 10,000 were active. It did business in twenty-nine branch offices. (Tr. 11/14/90, p. 34).

On December 13, 1988, a District Surveillance Committee of NASD directed Investors Center to discontinue within 30 days self-clearing its transactions with its customers. (Up to that point the transactions with customers in the over-the-counter speculative securities in which Investors Center made the market were all self-cleared.) Investors Center was also directed to transmit both credit balances and fully paid for securities to the parties entitled thereto so as to eliminate all customer obligations within 30 days. (Application of Irving H. Picard, Trustee, for Order Dismissing Customer's Objections to Trustee's Determination Notices and Confirming Trustee's Determinations Denying Customers' Claims and Incorporated Memorandum of Law (hereinafter "Application"), Ex. 1).

These limitations were imposed because the NASD's routine examination had uncovered various factors requiring the imposition of limitations on the business of Investors Center. This included non-compliance with SEC Rule 15(c)(3–1). NASD staff estimated that Investors Center had a net capital deficiency of $3½ million. The Committee's report indicated that two prior routine examinations had disclosed violations of securities law relating to record keeping and customer protection.

On January 3, 1989, the earlier order was modified so that the 30 days within which Investors Center had to discontinue self-clearing and eliminate obligations to its customers, began to run from the later date.

On February 3, 1989, Investors Center purported to transfer virtually all of its customer accounts to Wall Street Clearing Co. ("Wall Street"), a member of SIPC and of the New York Stock Exchange. (Application, p. 4, Exs. 2, 3). However, Wall Street has contended that the transfer of accounts was never completed and that Investors Center never transferred to it funds owing from customers of Investors Center. This shortfall subsequently became part of a settlement among SIPC, the Trustee and Wall Street. Nevertheless, most, if not all, of Investors Center's customers, including the claimants in these proceedings, were sent notice that their accounts had been transferred to Wall Street. Wall Street took over the responsibility of sending regular monthly statements to the former Investors Center customers, setting forth the status of the respective customer accounts.

After this liquidation proceeding was begun the Trustee routinely advised claimants that their claims had been fully satisfied by the transfer of the securities position in their account to Wall Street.

Up to the time the Investors Center closed its door any orders received at any of Investors Center's twenty-eight branch offices would be transmitted to the order room at Hauppauge, New York. It was up to the order room to punch the order into an automatic data processing terminal hooked into Wall Street, which notified Wall Street that a trade had taken place and a confirmation slip would then be issued by Wall Street. (Tr. 11/14/90, pp. 33–37).

February 22, 1989 was the last day that Investors Center was open for business.

Under date of February 23, 1989, Anthony J. DeStefano, Controller of Investors Center, wrote NASD that Investors Center had voluntarily suspended security business as of the morning of February 23, 1989 due to "a possible capital deficiency" and that it had "verbally advised the NASD District 12 Office of the situation at 8:30 a.m. February 23, 1989." (Application, Ex. 6). Wall Street apparently started to foreclose on its collateral that day.

But not until February 28, 1989, five full days later, did SIPC file the complaint initiating this liquidation proceeding in the United States District Court for the Eastern District of New York. The complaint recites that SIPC has determined that Investors Center has failed to meet its obligations to its customers under Section 78eee(a)(3) of SIPC and that there exists one or more of the conditions specified in Section 78eee(b)(1) in that Investors Center is not able to meet its obligations as they mature and is not in compliance with applicable requirements of Section 15(a) of the Securities Exchange Act of 1934 and Rule 15c3–1, 17 C.F.R. §§ 240.15c–3–1 promulgated thereunder.

By Order to Show Cause issued the same date, Investors Center was ordered to show cause on March 7, 1989 why an order should not be entered adjudicating the customers of Investors Center to be in need of protection afforded by SIPA. The Order to Show Cause appointed Irving H. Picard, Esq. as temporary Trustee. Before that date, Investor Center, without answering the complaint, consented "solely for the purpose of resolving this proceeding ... without admitting or denying any allegations ... and specifically reserving the right to deny any such allegations in any other proceeding, to the entry of the within order appointing a trustee for the liquidation of the business of the defendant pursuant to the Securities Investment Protection Act of 1970." (Consent of Defendant). Investors Center has never filed for protection under the bankruptcy laws.

On March 7, 1989, Mr. Picard, with the consent of Investors Center, was appointed Trustee for the liquidation of the business of Investors Center pursuant to Section 78eee(b)(3) of SIPC. At the same time, the liquidation proceeding was removed from the District Court to this Court in accordance with Section 78eee(b)(4) of SIPC "To the extent consistent with the provisions of [SIPC]" and pursuant to Section 78fff(b) thereof, this liquidation is being conducted in accordance with Chapters 1, 3 and 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code. (Application, p. 2).

IV

During the period between the date Investors Center was directed by NASD to clear up its accounts with its customers and the date it closed its doors, it improved its position at the expense of its customers, in two ways: First, Investors Center claimed that it received orders to purchase which the customers deny placing; and second, Investors Center failed to execute sell orders.

The extent to which Investors Center falsified purchase orders is indicated by the settlement among the Trustee, SIPC and Wall Street relating to Wall Street's claim against Investors Center. The application by the Trustee for approval of the settlement recites that 155 persons whose accounts had been transferred to Wall Street Clearing Company allege that certain purchase transactions shown on their accounts for February 1989 were unauthorized and improperly executed. In all, $1,050,000 in debit liability was denied. The Trustee stated that based on his investigation of the "allegations that unauthorized and improper transactions were executed by the Debtor for their accounts at Wall Street, the Trustee is satisfied that such claims have merit." (Application For an Order Approving Stipulation of Settlement of Certain Claims and Authorizing Trustee to Enter Into Stipulation and to Executive [sic] All Necessary Documents, pp. 7, 8 (hereinafter "Stipulation")).

Attached to the Stipulation as an exhibit is a letter from Wall Street Clearing to Stephen Harbeck, Esq. and the Trustee dated May 15, 1990 giving further detail regarding these unauthorized transactions,

as to some of which representing $437,000 filed claims with the Trustee, most of whom did not. The following excerpt is illuminating:

As you are aware, we have received notification from customers of ICI that ICI engaged in additional extensive unauthorized trades in customer accounts ... such customers reasonably believed that simply by denying that they entered into trades, which was in fact unauthorized, they had no liability for such trade and therefore no SIPC claim. In fact, such customers do have liability for such trades and several such customers have, in arbitration, been required to make payment for such trades.

(Stipulation, Ex. E)

In return for payment by SIPC of $660,-000, Wall Street agreed, among other things, to cease collection efforts against these customers. The dollar amount of unauthorized trade claims, both by persons filing claims with SIPC and those not filing claims is estimated to be approximately $1,156,000.

At the same time as Investors Center was falsely claiming purchases, it was not executing sale orders confirmed by their representatives. Many customers have appeared before this Court to protest the refusal of the Trustee to recognize a claim for cash, rather than securities, based on these unexecuted sales. Typical of these customers is Mr. William Hausman, Jr., whose claim was heard at the same time as the objections dealt with in this Opinion. Mr. Hausman testified that on February 17, 1989 he telephoned his broker at Investors Center and ordered him to sell his position of 57,000 shares in All Quotes for 13 cents per share. (Tr. 11/14/90, pp. 9–15). Later that day his broker advised him that the stock had been sold. The settlement date was February 23, 1989, the day after Investors Center ceased operating. SIPC and the Trustee's position was that while:

Mr. Hausman has a perfectly valid general creditor claim for the breach of contract and the failure of his brokerage firm to execute the sale order, SIPC is

nonetheless constrained by the law and the rules, ... which have the effect of the law, to reach the conclusion that he is owed by the Trustee only the securities that were in his account on the filing date of this proceeding.

(Tr. 11/14/90, p. 17).

SIPC's position is that under Rule 502(b)(1) "despite the fact that Mr. Hausman directed his broker to sell, despite the fact that the broker initiated the sell order, that he has only a claim for securities because there is no evidence that the sale was ever executed by Investors Center." (Tr., 11/14/90, pp. 23, 24.)

The Court has up to this point in time sustained the Trustee's position that customers in the position of Mr. Hausman have only a claim for securities and not a claim for cash. The Trustee had advised an unknown number of claimants that credit balances based on executed trades are not entitled to protection under SIPA. (Trustee's First Interim Report For The Period Ending April 30, 1989, p. 12) The dollar amount of these transactions is unknown but there is no reason to believe that they are any less in magnitude than the unauthorized purchase orders Investors Center attributed to its customers.

## V

After the proceeding instituted by SIPC on February 28, 1989 was referred to this Court, the Court established procedures for the reception and resolution of claims in this proceeding. Claim forms were mailed to almost 50,000 customers, including the nine customers here involved, all of whom have asked for judicial review of the rejection of their claims by Mr. Picard. These objections have been made the subject of two separate motions. The facts are not in dispute.

Dr. Donald and Ilene B. Raphael claim a credit balance of $22,000, based on a sale which they requested on February 16, 1989. In support of this claim Dr. Raphael has submitted a letter from Richard McGuire, identified as "Account Representative" of the Investors Center branch involved. Mr. McGuire writes that he "sub-

mitted the sell ticket of 275,000 shares of Affiliated National at .08¢ per share"; that "the order was given to the order room, was processed and was then confirmed as being done on the daily blotter, which is the company's reporting of transaction done daily," that McGuire then reported the transaction to Dr. Raphael the following day. (Application for Order Dismissing Objection of Donald and Ilene B. Raphael to Trustee's Determination, Ex. H). However, in the statement issued by Investors Center for the period ended February 28, 1989 for the account maintained for these customers, no sale is shown. But Dr. Raphael did receive from Wall Street a confirmation dated February 22, 1989 for the sale of 75,000 shares of Affiliated for a net amount of $4,672.50. As in the case of the other claimants, this was subsequently followed by a similar document, with the same trade date, February 22, 1989, purporting to cancel the prior confirmation.

Theresa Ruffolo submitted a claim for $21,281. She claimed to have sold on February 16, 1989 8,250 shares of KBF for net proceeds of $7,218 and 10,000 shares of ICI Holding Company for net proceeds of $10,-000. She further alleged that on March 17, 1989, which was after Investors Center closed its doors, she ordered the sale of the balance of her account. With her claim she submitted a confirmation of sale from Wall Street Clearing for the 8,250 shares of KBF. The trade date was February 22, 1989. The net was $6,172.50. As in the case of the others, the written confirmation was followed up by a cancellation, bearing the same trade date. No confirmation was received of the post-confirmation sales of ICI and KBF. (Trustee's Application For Order Dismissing Objections of Theresa Ruffolo to Trustee's Determination, Ex. G).

Richard J. Clarke is claiming a credit balance of $576.25 based on two sales on February 22, 1989. On that date Wall Street confirmed to Richard J. Clarke the sale of 3,800 shares of All Quotes for a net amount of $341.25. Mr. Clarke had also instructed his broker to sell 10,000 shares of Yardley. Subsequently, he received two notices from Wall Street cancelling sell confirmations for 3,800 shares of All Quotes and 10,000 shares of Yardley.

Robert Thomas had tried to move his account out of Investors Center on October 28, 1988, but Investors Center had not followed his instructions, but had retained his share of All Quotes. Concerned about the solvency of Investors Center he telephoned the Hauppauge office on February 22nd requesting a "same-day" sale of his All Quotes stock. The broker to whom he spoke at Investors Center agreed to effect the transaction on a same-day settlement basis. (Tr. 11/14/90, p. 113). Wall Street confirmed two sales as of that date, one of 25,000 shares of All Quotes and the other of 75,000 shares for a total amount of $8,313.75; In late March he received cancellation notice of both sales. (Tr. 11/14/90, p. 106).

Frank Felix's situation is somewhat different from the others. Frank Felix is claimed to have purchased 20,000 shares of Minimatic Implant Technology on February 6, 1989 for a total price of $15,015. After he made the purchase he tried to cancel the sale and stopped payment on the check which he had issued in payment after Investors Center told him the trade was cancelled. He is now being sued by Wall Street Clearing for the amount owed. Several sales of this stock were made purportedly on his account to Investors Center and credited to his account up to a sale of 13,000 shares on February 22, 1989. On February 13th 2,000 shares were sold for a net amount of $1,735; on February 15th, 2,000 shares for a net amount of $1,735; on February 16th, 3,000 shares for a net amount of $2,610. All these sales were confirmed to him. On February 22, 1989, the balance of the shares still held by him were sold for a net amount of $15,422. These shares had been bought for 75 cents a share and were sold for $1.18 a share. The following day, Felix received a notice from Wall Street cancelling the earlier confirmation. His Wall Street Clearing account as of February 1990 reflected all the confirmed sales except the 13,000 shares for a net amount of $15,422 which was subsequently cancelled. Felix originally requested the difference between the price

of the shares he bought—$15,015—and the total amount reflected on the sale confirmation of $21,502.50, or $6,487.50, but his present claim is for $21,502.50, the amount of the sale confirmed to him just before Investors Center closed its doors.

The other sales confirmed by Wall Street on February 22, 1989 are: to Jack A. De-Franza, 50,000 shares of Zephyr for a total return of $4,672.50; to Edward Palmese the sale of 33,400 shares of "All Quotes" for a total return $3,116.25; to Salvatore and Lucy Vella of 4,600 shares of Minimatic for a total credit of $3,722.50; and to Frank Felix, Jr. of 13,000 shares of Mini-matic on February 22, 1989 for a total price of $15,422.

The claims of each of the customers here involved for cash have been rejected on the same ground. Each was sent the same letter reading:

> Although you submitted copies of the confirmations of sales issued by Wall Street Clearing Co., the firm which was processing transactions on behalf of customers of Investors Center on and after February 3, 1989, you failed to provide copies of the confirmations showing that the trades were cancelled. Copies of the cancellation notices issued by Wall Street Clearing are enclosed.
>
> The written cancellations appear to have been proper in view of the fact that Investors Center was purchasing the securities from you at a time that it was insolvent and did not have the funds available to complete the transactions. In any event, if the sale transactions had been completed and your account credited with the proceeds, the Trustee would have had the right to seek to avoid the transactions as involving a fraudulent transfer under the Bankruptcy Code. *See* SIPC Rule 503(a), 17 C.F.R. 300.-503(a).

(Application, Ex. 7)

Except that the Trustee is no longer claiming that the sale if completed would involve a fraudulent transfer, he adheres to his position that these customers, despite the receipt of a written confirmation of sale from Wall Street have a claim only for securities they sought to sell, and not a claim for the cash they would have received had the sale taken place.

## VI

The decision of this matter is controlled by the Rules of SIPC entitled "Rules Relating to Satisfaction of a 'Claim for Cash' or a 'Claim for Securities.'" These Rules were adopted in March 1988 pursuant to the authority conveyed on SIPA by the 1978 Amendments, respecting which the House Reports said: "New procedures appropriate to legislative, rather than interpretive rules, are provided since SIPC's rules will have the force and effect of law." H.R.Rep. No. 95–746, 95th Cong., 1st Sess. 25 (1977).

The section pertinent to this case is the section defining when a customer has a claim for *cash*. A customer has a claim for cash:

> (1) If the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or
>
> (2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

(17 C.F.R. § 300.501(a)(1), (2))

It is undisputed that each of these claimants received *written confirmation* from the Debtor's clearing agent that the securities in question had been sold for, or purchased from, the customer's account. Each of these creditors, therefore, comes squarely within the provision defining when a customer has a claim for cash. The Rules are as binding on the Trustee and on SIPC as they are on the public. The Trustee is not free to ignore them or rewrite them.

The Trustee's reasons for refusing to recognize these customers as being entitled to cash despite the fact that each has received written confirmation of a sale entitling that customer to cash are not persuasive. As already noted, he first assert-

ed, but does not now press the claim, that the sale, if recognized, would constitute a fraudulent transfer.

Now he urges two grounds: First, that "based on the facts (including ICI's inability to pay for the purported purchases and that if the customers wish to rely on sales confirmations they cannot ignore the cancellation notices which advised them they had no credit balances), this Court should not now order reversal of the cancellations by ICI and thus force SIPA to advance funds to the Trustee (section 78fff–3(a) of SIPA) to pay these customers for alleged sales to ICI that it was in no position to complete." (Application, pp. 13, 14). Second, he also urges the transfer of the accounts of these customers to Wall Street constituted satisfaction of their claims. "Since the customers' accounts, including the securities in question here, were transferred to Wall Street Clearing, the Trustee submits that the customers' claims have been satisfied." (Application, p. 10).

The reasons the Trustee gives why Mr. Clarke's objections should be dismissed are representative:

His claim against ICI [Investors Center] was satisfied by the transfer of his account (the All Quotes and Yardley shares) to Wall Street Clearing in February 1989, prior to the commencement of the SIPA liquidation proceeding. He is entitled to no customer protection relief from the Trustee or the ICI estate.

30. Mr. Clarke is not entitled to customer protection for an alleged credit balance of $576.25 based on the sales of All Quotes and Yardley on February 22, 1989 and the cancellations processed on February 23, 1989. We note that the confirmation and cancellation slips at the top right were coded to inform Mr. Clarke that the transactions took place in the over-the-counter market (M–6) and that the stock had been purchased by ICI "as principal" (C–7) (see Wall Street Clearing sale confirmation and cancellation slips included as part of Exhibit 7). ICI was the primary market maker for All Quotes and Yardley, it had no money to pay for the purported purchases and

the purported purchases were not designed to improve its financial condition. (*see* note 7, *supra*). As set forth above (paragraphs 10–11, 22–23), ICI having neither the funds nor access to funds to pay for the purported purchases, it instructed Wall Street Clearing to cancel Mr. Clarke's sales. Under the circumstances, the Trustee submits that to the extent Mr. Clarke relies on the confirmations of the All Quotes and the Yardley sales to support his claim for a credit balance he cannot ignore the cancellation notices that were also sent to him. At the commencement of this liquidation proceeding, Mr. Clarke had no basis on which to believe he was owed a credit balance by ICI. The cancellations of his All Quotes and Yardley sales at best gave rise to causes of action for fraud or breach of contract, neither of which is entitled to customer protection under SIPA (*see* Paragraphs 15–18, *supra*).

(Application, pp. 1, 15–17).

Parenthetically, it might be observed that there is nothing in the record to support several of the Trustee's factual assertions. Thus, for example, it is unclear whether Wall Street cancelled the sale on instruction from Investors Center or on its own initiative. Who at Investors Center gave the order to cancel, and when, since Investors Center suspended business as of 8:30 a.m. February 23, 1989? Along the same lines, although the Trustee describes the cancellations as "processed on February 23, 1989" which is the date they bear, it is not clear from the record when they were in fact prepared or processed. Mr. Thomas testified that he received the cancellation notice weeks after he had received confirmation of his sale. Similarly, Mr. Vella testified that his notice of cancellation was received a full week after the notice of confirmation although they bear the same date, February 22, 1989.

■ But in any event, under the SIPC Rules quoted earlier and under general principles of contract law it makes no difference when the so-called "cancellation notices" were generated or mailed. They could not wipe out the legal effect of the

written confirmation of sale sent earlier. They were unilateral notices that Investors Center was breaching the sale it had earlier confirmed. But under SIPC's rules it is not performance that is critical, but receipt of written confirmation of sale. This is clear from the Rules themselves. The customer has a claim for cash in either one of two circumstances. The customer has a claim if the securities in question "have become the subject of a completed or executory contract for sale...." Rule 501(a)(2). If that were all the Rule said, the cancellation notice might have been fatal to the claims of these customers. But under the Rules the customer also has a claim when the customer has been sent "written confirmation" of a sale. (Rule 501(a)(1)). If the Trustee were correct, the customer would have a claim for cash only where the securities in question had "become the subject of a completed ... contract for sale" whereas the Rules attach equal finality to the receipt of a "written confirmation ... that the securities in question have been sold." To require the sale actually to be completed, even though confirmation had been sent, is to read Rule 300.501(a)(1) out of the statute. But as the Rules make clear, not both requirements, i.e., confirmation and execution, need be met, only one.

In this case the customers received written confirmation. Therefore, they have a claim for cash regardless of the fact that the contract was never executed because of Investors Center's breach. It makes no difference why Investors Center breached the contract. Thus, it is irrelevant that the cancellation which the Trustee elects elsewhere to denominate the "second confirmation" was issued "because the Debtor had no cash to complete the purchase of such securities on February 22, 1989." (Memorandum of the Securities Investor Protection Corporation In Support Of The Trustee's Motion Concerning the Claim of Theresa Ruffolo, p. 13). The insolvency of Investors Center, the very condition SIPA was enacted to deal with, certainly cannot serve as an excuse for denying a customer less than that to which he is entitled under the Act and its implementing Rules.

SIPC argues that the Trustee "is not free to recognize the confirmation of the sale and simply ignore the second confirmation which cancelled it." (Id., p. 14). This suggests a false symmetry. The so-called "second confirmation" confirmed nothing. No customer had requested the cancellation of the sale of his stock nor consented to it. To call it a confirmation is to play with words and to try thereby to fit a cancellation notice into the SIPC rules where it has no place.

As SIPC has consistently stressed during the course of these proceedings, we are dealing with rights under a specific statute as implemented by specific rules. To quote Stephen P. Harbeck, Senior Associate General Counsel for the Securities Investor Protection Corporation, the Rules were intended to "provide a bright line Rule for future litigants and future claimants as to when a claimant was entitled to cash and when a claim [sic] is entitled to securities." (Tr. 11/14/90, p. 21) Under that "bright line" rule, once a customer has received a "written confirmation" of sale, as each of these customers did, he has a claim for cash.

The issue here, as the Trustee has consistently argued, is not what the obligations of Investors Center are to its customers under contract, or common law, but what rights, if any, those customers have under a very specific and narrow statute to reimbursement from a particular fund. That the notice of cancellation constituted a breach of contract is immaterial to their statutory rights. The Trustee attempts to turn around the principle that SIPA does not protect against breach of contract and contends that because the so-called cancellation gave rise to a claim for breach of contract that the customer can claim nothing under the Securities Investor Protection Act. This is a logical fallacy. It is true that a customer who has nothing but a breach of contract claim cannot recover under SIPA, but it does not follow from the fact that a customer who has a recognizable claim under SIPA may also have a claim for a breach of contract that he cannot recover for the former. One does not

nullify the other. The customers here involved all have claims under the Securities Investors Protection Act because each one received written confirmation of a sale. That they may, or may not, also have claims for breach of contract against Investors Center, claims which, as everyone recognizes are valueless, does not deprive them of their rights against the Fund created by SIPA.

■ The Trustee raises another obstacle to these creditors' claims, saying that he has determined that their claims have been "fully satisfied by the transfer of the securities positions in their account to Wall Street Clearing Company for their benefit." Except that the Trustee appears to urge this most seriously, the Court would deem the contention too frivolous even to consider. First, the Trustee cites no legal authority for the proposition that the partial transfer of an account from an insolvent broker dealer to a different broker-dealer wipes out the customer's claims under SIPA, particularly post-transfer. All the claims here involved are post-February 3, 1989, the date of the transfer.

After a liquidation proceeding has begun, Section 78fff–2(f) authorizes the Trustee to transfer accounts from the debtor to another SIPC member to facilitate the prompt satisfaction of customer claims, but that is a very different thing from making a pre-filing transfer conclusive of a customer's rights. If it were believed that the transfer to Wall Street Clearing Company discharged the responsibilities of SIPC under SIPA, why was this proceeding filed in the first place since all, or virtually all, of Investors Center's accounts were transferred to Wall Street Clearing on February 3, 1989? If the argument were sound that transfer alone gave customers whatever they were entitled to claim, SIPA imposed on the Court by initiating this proceeding. By acknowledging and paying many claims against Investors Center, the Trustee has lost the right to make an argument that would cause SIPA to function in a blatantly discriminatory and arbitrary manner.

The Trustee's argument exploits the poor fit between this proceeding and the assumptions underlying SIPA. One of which is that SIPA steps in when a broker-dealer files for bankruptcy. That poor fit has led this Court to treat as the critical date for the application of Rule 500 the date that Investors Center closed its doors and became a *de facto* bankrupt: the end of business February 22, 1989, not the much later date on which SIPC belatedly filed this proceeding, February 28, 1989, the "filing date" under the statute. § 78*lll* (7). SIPC's delay in taking action, whatever the reasons, should not prejudice the customers of Investors Center nor deprive them of the protection which Congress intended them to have when a broker-dealer is determined to be insolvent.

## VII

The Trustee cites two cases as supporting his refusal to recognize these customers as having claims for cash. *SEC v. JNT Investors, Inc.*, [1979 transfer binder] CCH Federal Securities Law Fed.Sec.L.Rep. ¶ 96,729, 1978 WL 1137 (Bankr. S.D.N.Y.1978) and *SEC v. Howard Lawrence & Co., Inc.*, 1 BCD 577 (S.D.N.Y.1975). They are not helpful. Both were decided ten years or more before the adoption of the Rules which dictate the result here. They stand only for the principle that SIPA does not cover claims arising from breach of contract. The Court can find no basis for the Trustee's description of the present Rules as codifying the results reached in these cases.

A far better candidate for the source of the 1988 Rules is the Sixth Circuit's 1987 decision in *In re Bell & Beckwith*, 821 F.2d 333 (6th Cir.1987) which involved the reverse of the situation here. There, it was to the advantage of SIPC and the Trustee and to the disadvantage of the customers for the customers' claim based on an uncompleted sale of securities, confirmed prepetition, to result in a claim for stock and not a claim for cash. In that case, the day before the broker filed in bankruptcy it confirmed the sale of 3,500 shares partly to itself. The sales were reflected on trade tickets and reported to the customers. The

trade date was the day before the brokerage firm filed for bankruptcy, the settlement date was some days later. Post-filing, the Trustee cancelled the transaction insofar as the broker was the purchaser and credited the customers' accounts with the agreed upon sales price. Because the shares had appreciated in value, the customers' position was that they had a claim against the estate for the shares rather than for cash. The Trustee and SIPC deemed their claims to be for cash.

The Sixth Circuit reversed both the Bankruptcy Court and the District Court which had held that the customers were entitled to the stock, not cash. The reasons given by the lower courts was that the stock was never sold, first, because it had not been sold before the filing date and, second, the Trustee had no authority to complete the transaction after the filing date. The appellate court concluded that, despite the fact that the sale had never been completed, what the customers had was a claim for cash. It found support for this conclusion in the overall design of the statute:

> We are persuaded that Congress intended the exact same policy to apply to the customers of the debtor as applies to customers of brokers who dealt with the debtor. They should remain, as much as possible, unaffected by their broker's collapse. The best way to do this is either to complete trades ordered before the filing date or to settle out with customers *as if those trades had been completed.*

821 F.2d at 339 (emphasis added).

The Court concluded:

> We hold that, under SIPA, all trades ordered by customers of a debtor before the filing date should be treated, vis-a-vis those customers, as if subsequently completed by the debtor. Those customers who ordered stocks held for them by the debtor to be sold before the filing date have a claim against the estate for the purchase price, not for stock,....

821 F.2d at 340.

The Rules adopted one year later by SIPA appear to have codified these guidelines. The Rules give a claim for cash, not for stock, to customers who, before the filing date ordered stocks held for them by the debtor to be sold, regardless of whether pre-filing such sale has actually taken place or not.

Because of the written confirmation notices sent out on February 22, 1989, each of the objecting customers has a claim for cash in the amount of the sale confirmed to each on that date.

## VIII

The conclusion that each of these customers is entitled to be paid the amount of cash represented by the confirmed sale on February 22, 1989 is as valid for Felix as for each of the other claimants. The Trustee has attached great importance to the fact that up to the date of the hearing herein Felix has not paid for the stock which was the subject of the sale on February 22nd. But it was finally conceded that he is being sued for the purchase price by Wall Street.

Whatever the arrangements between Investors Center and Wall Street Clearing they both have taken the position that the purchase on February 6, 1989 of 20,000 shares of Minimatic which Felix sought to rescind was completed. They must take the benefits and burdens of that position. Felix owes money for the stock, but by the same token the stock was his to sell and since he sold on February 22, 1989 13,000 shares of the 20,000 shares he had purchased earlier he is entitled to the proceeds of $15,422.50. He will, of course, have to pay Wall Street Clearing the agreed upon purchase price, but there should be no difficulty in sorting out these facts before the appropriate tribunal should the litigation not settle itself in the light of this opinion.

It is true by emerging whole, or even with a small profit, he will be doing better than many of the other small investors who became involved with Investors Center, that is he is no worse off than if he had been dealing with an honest, solvent firm. Counsel for SIPC charges him with taking a "free ride" but the facts here are very different than those in *SEC v. Packer,*

*Wilbur & Co., Inc.*, 498 F.2d 978 (2d Cir. 1974) and *SEC v. Provident Securities, Inc.*, 452 F.Supp. 477 (S.D.N.Y.1978) relied on by SIPC. There was no overreaching or fraud or violations of law by Felix here. To this Court, the position of SIPC appears to be subject to criticism. On the one hand its member, Wall Street, insists that Felix owes for the relatively worthless stock Investors Center unloaded on him and, on the other hand, SIPC would deny him the right to recapture his purchase price through a sale made in the last days during which Investors Center was allowed by SIPC to continue in business.

■ Regrettably, insofar as Dr. Raphael and Mr. Clarke rely on sales for which they never received confirmation, they are not entitled to cash. The Trustee's determination that each has received what he is entitled by the return of the securities which each tried to sell, must be sustained consistent with the earlier rulings this Court has made in this proceeding.

For whatever reasons these trades were never executed and, therefore, return of the unsold securities gives them whatever they are entitled to claim under SIPA. They may have a claim for breach of contract, but that gives them at best a general claim against an estate without assets.

## IX

For many of the victims of Investors Center, like Mr. Hausman, the Securities Investment Protection Act has proved to be grossly misnamed.

The barriers SIPA was thought to have erected for the protection of customers of broker-dealers, like Investors Center, have turned out to be insubstantial. Neither regulation nor reimbursement has worked.

Repeatedly this Court has been forced to tell claimants that the fund created for the protection of customers of honest, but insolvent, brokers gives them no protection when the insolvent broker has been guilty of dishonesty, breach of contract or fraud.

But SIPA does not stop with providing a civil remedy. SIPA in addition to providing for liquidation proceedings, also makes it a crime for "Any person who, directly or indirectly, in connection with or in contemplation of any liquidation proceeding [to] employ any device, scheme or artifice to defraud; engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; or fraudulently or with intent to defeat ..." (§ 78jjj(c)) SIPA engages in a variety of other acts.

Further, SIPA directs the Trustee "as soon as practicable, [to] investigate the acts, conduct, property, liabilities and financial condition of the debtor" and report to the Court "any facts ascertained by the trustee with respect to fraud, misconduct, mismanagement and irregularities and to any causes of action available to the estate." 78fff–1(d).

From the less than complete information available to the Court, it appears, as said earlier, that during February 1989 Investors Center took advantage of the split in responsibilities between it and Wall Street to report purchases by customers that were never made and to hold back the transmission of sales ordered by its customers.

The magnitude of the operations involved, well over a million dollars, goes far beyond mere breach of contract. It suggests an overall design on the part of those persons in charge of Investors Center, meriting further investigation by the Trustee to determine whether any law, including SIPA, has been violated. There would appear to be at least a question whether there was present here a "course of business," operating as a "fraud or deceit," upon persons placing sell orders with Investors Center in its last weeks of operations, a course of business prohibited by 78jjj(c)(1)(B).

Because so many investors were badly hurt, the operations of Investors Center in its closing days warrants extensive scrutiny.

## X

This Court has jurisdiction of this proceeding pursuant to the Order of the Honorable Leonard D. Wexler, Judge of the United States District Court for the East-

ern District of New York, removing this liquidation proceeding to the Bankruptcy Court pursuant to § 78eee(b)(4) of SIPA.

Each of the following is entitled to be paid to the payment of cash by the Trustee in the amount opposite their name:

| | |
|---|---|
| Theresa Ruffolo | $ 6,172.50 |
| Donald & Ilene B. Raphael | $ 4,672.50 |
| Richard J. Clarke | $ 341.25 |
| Jack DeFranza | $ 4,672.50 |
| Frank Felix, Jr. | $15,422.00 |
| Edward Palmese | $ 3,116.25 |
| Salvatore & Lucy Vella | $ 3,722.50 |
| Robert Thomas | $ 8,313.75 |

Insofar as each of these individuals has objected to the determination of the Trustee denying them cash, their objections are sustained.

The Trustee is requested, without prejudice to his right to appeal, to settle an order on notice to each of the customers named above consistent with this Opinion.