**In re ADLER, COLEMAN CLEARING CORP., Debtor.**

**Edwin B. MISHKIN, as SIPC Trustee for the Liquidation of the Business of Adler, Coleman Clearing Corp., Plaintiff,**

**v.**

**Daniel David ENSMINGER, et al., Defendants.**

**Bankruptcy No. 95–08203 (JLG).
Adversary No 97/8423A.**

United States Bankruptcy Court, S.D. New York.

March 6, 1998.

Cleary, Gottlieb, Steen & Hamilton, New York City, for trustee.

Zeisler & Zeisler, P.C., Bridgeport, CT, for defendants.

### MEMORANDUM DECISION ON MOTION TO DISMISS COMPLAINT SEEKING JUDGMENT UPHOLDING TRUSTEE'S DETERMINATIONS CONCERNING CERTAIN CUSTOMER CLAIMS

JAMES L. GARRITY, Bankruptcy Judge.

Approximately 90 former customers of Hanover Sterling & Company, Ltd. (collectively, "movants"),[1] an introducing broker whose trades were cleared by Adler, Coleman Clearing Corp. ("Adler" or "debtor") prior to the commencement of a proceeding against it under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa to 78*llll* ("SIPA"), move pursuant to Fed.R.Bankr.P. 7012 and Fed.R.Civ.P. 12(b)(6), for an order dismissing that certain Application Upholding the Trustee's Determination Denying Claims of Certain Customers Who Seek to Benefit from Fraudulent Transactions and Expunging Objections with Respect to those Transactions (the "Complaint")[2] filed by Edwin B. Mishkin, SIPC trustee for the liquidation of Adler (the "trustee"), seeking to uphold his determinations concerning their claims. The trustee and the Securities Investor Protection Corporation ("SIPC") oppose the motion. We deny it.

---

1. In addition to the former customers listed in Exhibit A to movants' memorandum of law in support of their motion to dismiss, the following defendants have joined in the motion: Patrick G. Cleveland, Jay H. Harris, Louis Grandelli, James J. Finn and Sarah C. Finn, Vincent D. Potere, Georgios Kapsalis and Maria Kapsalis, Paul Alter, Dr. Jude Barbera, Catherine Romano and John Romano and August Nigro.

2. After hearings before this court, and pursuant to a scheduling order entered thereafter, we deemed the trustee's application a complaint initiating an adversary proceeding under Part VIII of the Federal Rules of Bankruptcy Procedure.

### *Facts*

On February 27, 1995 (the "Filing Date"), SIPC commenced a liquidation proceeding against debtor under § 78eee(b) of SIPA in the United States District Court for the Southern District of New York. District Judge Loretta A. Preska thereafter ordered that the liquidation proceeding be removed to this court and appointed the trustee to liquidate debtor's remaining assets.

Prior to the Filing Date, Adler was a registered broker/dealer of securities and a clearing firm for 42 introducing broker/dealers.[3] Debtor was also a member of the National Securities Clearing Corporation ("NSCC"), SIPC and the National Association of Securities Dealers, Inc. ("NASD"). It held approximately 66,000 active customer accounts on the Filing Date.

Hanover was one of the introducing firms that cleared trades through debtor. Hanover was a registered broker/dealer that acted as an underwriter and market maker for various securities, including, among others, All–Pro Products, Inc. units, American Toys, Inc. common stock, Envirometrics, Inc. common stock and warrants, Mister Jay Fashions Int'l, Inc. common stock and warrants, Panax Pharmaceutical Co. Ltd. units, Play Co. Toys common stock, warrants and units, Porter McLeod common stock and warrants and Eagle Vision, Inc. common stock (collectively, the "House Stocks"). Hanover was the initial underwriter for all of the House Stocks except the Eagle Vision, Inc. common stock, and all of these securities traded on the NASDAQ market, except Eagle Vision, which was listed on the "pink sheets".

As with all of its other introducing brokers, the relationship between debtor and Hanover was governed by a Fully Disclosed Clearing Agreement (the "Clearing Agreement"). As relevant here, that agreement provides that debtor, as Hanover's "agent" shall, among other things, "[c]lear and settle, and if requested to do so, execute transactions" upon Hanover's instructions in customer accounts introduced by Hanover, prepare and mail confirmations to the introduced accounts, settle contracts and transactions in securities between (i) Hanover and other brokers and dealers, (ii) Hanover and the introduced accounts, and (iii) Hanover and third persons, and perform cashiering functions for the introduced accounts, including receiving and delivering securities purchased or' sold, and receiving payments therefor. Clearing Agreement ¶ 3. Paragraph 3(b) of the Clearing Agreement provides that

> Notwithstanding anything contained in Paragraph 3(a) to the contrary, [Adler] may, [if it has reasonable grounds to believe] such action is necessary to protect its interests, refuse to open an account for a specific customer; close an account already opened; refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash, securities or other property; refuse to clear any transaction executed by [Hanover]; or refuse to execute any transaction for an introduced Account (notwithstanding its acceptance by the Introducing Firm pursuant to Paragraph 5(d)). [Adler] shall use its best efforts to notify [Hanover] of any such action in advance thereof if it is able to do so without jeopardizing its economic interests....

Clearing Agreement ¶ 3(b) (all bracketed material in original except for names).

Paragraph 6(g) of the Clearing Agreement provides that

> Should [Hanover] entrust the execution of an order to [Adler], [Adler] will assume the responsibility for any failure by the contra broker to pay or deliver pursuant to the transaction and will reimburse [Hanover] for any loss sustained thereby. In case [Hanover] executes its own order or designates the contra broker, [Hanover] will assume the responsibility for any failure by the contra broker to pay or deliver pursuant to the transaction and will reim-

---

**3.** An introducing firm buys and sells securities on behalf of its customers or for its own account, and may underwrite or make markets in securities. By contrast, a clearing firm or a "broker's broker" processes or "clears" trades made by introducing firms. Most large securities firms clear their own trades. Any broker not large enough to clear for itself must contract with a clearing broker to back its trades.

burse [Adler] for any loss sustained thereby....

Clearing Agreement ¶ 6(g). Pursuant to ¶ 7(i) of the Clearing Agreement, Hanover agreed to indemnify Adler from and against all claims, liabilities and damages arising from, among other things, the failure of either Hanover or its customers to make payment when due for securities sold for Hanover's account or the accounts of its customer. Clearing Agreement ¶ 7(i). The Clearing Agreement further provides that Adler "shall have no liability to any Introduced Account for any loss suffered by them" and that Adler's "liability will be only to [Hanover]". Clearing Agreement ¶ 13.

Hanover was confronted with a growing crisis in early 1995. As the primary market maker and an underwriter for the original public offering of the House Stocks, it owned many of the House Stocks itself and used them to meet its capital requirements. Also, many of its customers, including movants, owned large quantities of House Stocks. *See* Complaint ¶ 7. According to the trustee, a group of brokerage houses and persons related to those firms engaged in illegal "short-selling" of the House Stocks beginning sometime prior to February of 1995. The trustee alleges that Hanover originally attempted to respond to this massive short-selling pressure by acceding to the short sellers' extortion demands, but that the short-selling continued despite substantial payments made to them by Hanover. *Id.* The concerted short-selling of the House Stocks caused downward pressure on their prices, and, according to the trustee, Hanover was aware that the selling could eventually force it into bankruptcy and result in enormous losses for its customers. In an effort to support the price of the House Stocks, Hanover escalated its efforts to sell them to its retail customers, and began to record "phony purchases" by retail customers from its proprietary trading accounts. *Id.* ¶ 8. While customers did not authorize these "buys", debits were created in their accounts at Hanover that could never be paid. These debits were secured only by the artificially inflated value of the House Stocks. *Id.*

Specifically, the trustee contends that starting on approximately Monday, February 13, 1995, two weeks before Adler closed its doors, Hanover began to dump stock in its customers' accounts without informing them. Hanover's trading desk processed "buy" tickets for the House Stocks, and Adler cleared them. The Hanover customers who "bought" the House Stocks did not have the cash in their accounts to pay for them, and Adler automatically charged those customers' accounts with debits to cover the price paid for the House Stocks. *Id.* ¶ 29. Adler also automatically credited Hanover's proprietary accounts with the proceeds, and Hanover was able to use that credit to "purchase" more House Stocks. *Id.* By means of this illusory buying and selling, Hanover was able for a short time to artificially support the market for the House Stocks, and thereby maintain its minimum net capital requirements. *Id.* ¶¶ 30–31.

By Friday, February 17, 1995, however, key officials at Hanover understood that their efforts to absorb the massive short selling were futile. As alleged by the trustee, realizing that its days were numbered, Hanover continued to create fake "buys" of the House Stocks to prevent immediate depletion of its capital reserves, while simultaneously "selling" the House Stock out of the accounts of certain favored customers, and utilizing the proceeds of the "sales" to "buy" well-known securities with real value, including Apple, Dell, Ford, Cisco Systems, IBM, AT & T, Birmingham Steel and Microsoft (designated by the trustee and referred to herein as "Blue Chips"). *Id.* ¶ 31. Inasmuch as there never was actually any cash to acquire the Blue Chips, but merely the proceeds of House Stocks whose prices were artificially and fraudulently inflated by Hanover's alleged machinations, the trustee contends that the Blue Chip "buys" that were used to benefit Hanover's favored customers were fake, and that the "sale" of the House Stocks was part of a scheme to defraud Adler and SIPC. *Id.* ¶ 32.

The trustee contends that in Hanover's final week of business, from February 17–24, 1995, Hanover customers were forced to "buy" without their knowledge and against

their wishes at least $45.1 million of House Stocks at prevailing prices. *Id.* ¶¶ 33–57. For many Hanover customers, these alleged purchases were the only transactions ever recorded in their accounts. *Id.* ¶¶ 4–13; 26–55. The trustee alleges that more than 77% of the purported purchases were in accounts that had no trading activity, and in most instances, no assets while Adler cleared the accounts. *Id.* ¶ 35. The average House Stock purchase in those dormant accounts was more than ten times the average purchase in active accounts prior to that final week of trading. *Id.* More than 22% of the House Stock purchases in active accounts were at least five times greater than other transactions in those accounts. *Id.* ¶ 36. Other than during the period immediately following an initial public offering of securities, Hanover customers purchased an average of approximately $5–10 million in House Stocks per week; during the final week of trading, they purchased more than $59 million in House Stocks. *Id.* ¶ 37.

According to the trustee, at the same time, $31.5 million in House Stocks were sold from the accounts of Hanover's favored customers, thereby replacing their holdings in House Stocks with cash. However, because SIPA only provides cash coverage up to $100,000, Hanover used the "cash" credits in those accounts to purchase $18.7 million in Blue Chips. *Id.* ¶¶ 59–65. Hanover dealt almost exclusively in House Stocks. The trustee alleges that, most, if not all of Hanover's customers did not authorize the Blue Chip purchases, and that the purpose of the transactions was to give the favored customers the greatest and highest priority claim possible under SIPA. *Id.* ¶¶ 58 and 63. Outside of the final week of trading, in the aggregate, Hanover customers never bought more than $3.8 million in Blue Chips in any single day, and on most days did not buy more than $1 million worth of Blue Chips. In the final week, the few favored customers bought $18.7 million in Blue Chips—more than twice as much as any other 5 day period on Adler's records. *Id.* ¶ 62. Out of this amount, Hanover booked its favored customers with $15.4 million in Blue Chips on the last day of trading. Before the final week, the average individual Blue Chip buy on any given day

that Adler cleared for Hanover had never exceeded $45,000. On the last day of trading, the average was $218,759. *Id.* According to the trustee, prior to the final week, Hanover's favored customers had never previously purchased four of the nine Blue Chips in which Blue Chip buying was concentrated. *Id.* ¶ 63.

Certain of movants received confirmation of the final week trades, while others did not. Movants claim that they authorized the House Stock sales and Blue Chip purchases made for their accounts. For purposes of this motion, the trustee concedes that the trades in movants' accounts were authorized, and that movants had no knowledge of, or complicity in, Hanover's allegedly fraudulent activities during the relevant time period.

The trustee alleges that both Hanover and Adler were insolvent at the time that the Blue Chip purchases were made, the latter because it was forced to accept Hanover's massive trading losses. *Id.* ¶¶ 76 through 89.

The approximately 66,000 customer accounts whose trades cleared through Adler were frozen on the Filing Date, with the result that those customers could not trade in or otherwise access their accounts as of February 27, 1997. Between March 18, 1995 and April 26, 1995, the trustee transferred all but approximately 1,500 Hanover accounts to other broker-dealers, thereby giving almost all of Adler's customers access to their accounts. The trustee retained most of the 1,500 remaining customer accounts in order to investigate allegations of unauthorized trading and other possibly fraudulent activity in connection with those accounts.

Pursuant to procedures established by our March 10, 1995 order and SIPA, notice of the pendency of this SIPA case was given to Adler's customers, who then filed claims against debtor for whatever cash or securities they believed were in their accounts as of the Filing Date. Each movant filed a claim seeking cash and/or securities in its account. The cash claimed allegedly comes from Hanover's sale of House Stocks, while the securities are Blue Chip stocks that the movants contend were purchased on their behalf with the cash proceeds of the sale of the House

Stocks. After reviewing those claims and debtor's books and records, the trustee rejected movants' claims on the grounds that the series of transactions involving the sale of the House Stocks and the purchase of the Blue Chips was part of a massive fraud. Each movant objected to the trustee's determination, and in accordance with our March 10, 1995 order, the trustee filed the Application for an order upholding his determinations with respect to movants' claims as well as claims asserted by certain other customers. Therein, he alleges, among other things, that the final week trades are illegal under federal securities laws, the criminal provisions of SIPA and the Martin Act (New York's blue sky law), and that they are avoidable as fraudulent transfers under §§ 548 and 544 of the Bankruptcy Code and the New York Debtor and Creditor Law. *See* Complaint ¶ 1.

### Discussion

We base our subject matter jurisdiction of this proceeding on 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4) and the district court order dated February 27, 1995 referring and removing debtor's case to this court. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### SIPA and the SIPC

SIPC is a non-profit corporation whose members include most interstate broker-dealers. SIPA establishes SIPC and, among other things, sets forth the procedures for liquidating financially troubled SIPC members. A broker or dealer automatically becomes a member of SIPC upon registration as a broker or dealer with the SEC under § 15(b) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78ccc(a)(2)(A).

SIPA was enacted in 1970 and was substantially revised in 1978. It affords limited financial protection to the customers of certain stockbrokers experiencing financial difficulties. *See generally SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). It protects customers of registered broker-dealers who have entrusted those broker-dealers with cash or securities in the ordinary course of business. *SIPC v. Ober-weis Securities, Inc. (Matter of Oberweis Securities, Inc.)*, 135 B.R. 842, 845 (Bankr. N.D.Ill.1991). A "customer" is any person who has a claim "on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer." 15 U.S.C. § 78*lll*(2). The term also includes "any person who has deposited cash with the debtor for the purpose of purchasing securities". *Id.; see also In re Omni Mutual, Inc.*, 193 B.R. 678, 681 (S.D.N.Y.1996).

"Essentially, a liquidation under the SIPA is a bankruptcy proceeding." *SIPC v. Ambassador Church Finance/Development Group, Inc.*, 788 F.2d 1208, 1210 (6th Cir.), *cert. denied sub nom. Pine Street Baptist Church v. SIPC*, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986). SIPA § 78fff(b) provides that to the extent consistent with SIPA, "a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." 15 U.S.C. § 78fff(b).

SIPA liquidations generally involve customer claims and claims of general unsecured creditors, which are satisfied out of a customer estate and general estate, respectively. The customer estate—which is not available to satisfy the claims of general unsecured creditors—is a fund consisting of customer-related assets. *See* 15 U.S.C. § 78*lll*(4). It is distributed pro-rata among customers. *See* 15 U.S.C. § 78fff–2(c)(1).

A SIPA trustee discharges a debtor's obligations to customers to the extent that they may be determined to the trustee's satisfaction from the debtor's books and records. 15 U.S.C. § 78fff–2(b). SIPC advances funds to the trustee—limited to $500,000 per customer, of which no more than $100,000 may be based on a customer claim for cash, as opposed to securities—as necessary to enable him to satisfy customer claims, within the limits of SIPA protection. SIPC becomes subrogated to customer claims paid to the extent of such advances. *See* 15 U.S.C.

§§ 78fff–3(a), 78fff–2(c)(1) and, 78lll(11); *see also Oberweis Securities*, 135 B.R. at 845; *In re MV Securities, Inc.*, 48 B.R. 156, 159 (Bankr.S.D.N.Y.1985). Those advances are repaid from funds in the general estate prior to payments on account of general unsecured claims. 15 U.S.C. § 78fff–3(a).

The value of a customer's account, or its "net equity", is the measure of its preferred SIPA customer claim. "Net equity" is, in substance, the total value of cash and securities owed to the customer by the debtor as of the filing date, less the total value of cash and securities owed by the customer to the debtor as of the filing date. 15 U.S.C. § 78lll(11). *See, e.g., SIPC v. Vigman*, 803 F.2d 1513, 1516 (9th Cir.1986) (claimant's net equity equivalent to amount that broker would have owed claimant had it liquidated holdings on the date SIPC filed protective decree, less outstanding debt owed by claimant to debtor). SIPC may not advance funds for claims against the broker that do not fall within the narrow scope of a customer's net equity claim. 15 U.S.C. § 78fff–3(a); SIPC Rules, 17 C.F.R. §§ 300.500 through 300.503.

### The Motion to Dismiss

Movants ask us to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6), as made applicable herein by Fed.R.Bankr.Proc. 7012. That rule permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In making this determination, we must accept as true all of the well-pleaded facts alleged in the Complaint. *See Square D Company v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S.Ct. 1922, 1923–24, 90 L.Ed.2d 413 (1986); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 60 (2d Cir.1985). We will not grant the motion unless it appears with certainty that no set of facts could be established at trial which would entitle the trustee to any relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Kolinsky v. Russ (In re Kolinsky)*, 100 B.R. 695, 705 (Bankr. S.D.N.Y.1989). We read the Complaint generously and make all reasonable inferences in favor of the non-movant. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 807 (Bankr.S.D.N.Y.1994). We do not weigh the evidence that might be presented at trial; rather, we determine whether the Complaint is legally sufficient. *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir.1990). "The issue is not whether [the trustee] will ultimately prevail but whether [he] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Movants contend that the Complaint must be dismissed because: (i) the trustee is estopped from arguing that the Blue Chip trades are "not real" and "never happened", since he has previously taken the position in this case that trades reflected in debtor's books and records, whether or not authorized, definitively determine the nature and extent of a customer's net equity for SIPA purposes; (ii) SIPC Rules establish a "bright-line" test for determining the nature of a customer's claim in connection with trades that are made but have not settled prior to the Filing Date, and application of those rules herein mandates that movants be given the Blue Chips (or their value) regardless of any fraud committed by Hanover in the final week of its existence; (iii) because the trades in question satisfy that "bright-line" test, the trustee's exclusive remedies to avoid them are avoidance actions under §§ 544, 545, 547 and 548 of the Bankruptcy Code, but because the trades were "settlement payments" and "margin payments" within the meaning of § 546(e), he can avoid them only if the transactions were intentionally fraudulent, and the Application fails to state a claim of intentional fraud by debtor or its customers; and (iv) even if not precluded by SIPA and the Bankruptcy Code, the non-bankruptcy avoidance claims must be dismissed because the trustee does not have the right to cancel the trades under the Clearing Agreement, the Blue Chip purchases made on behalf of movants are separate and distinct from the unauthorized purchases made by Hanover during its final week of trading, and the Application does not allege that movants committed any fraud or

engaged in any illegal conduct in connection with the final week trades. We address each of these in turn.

### *Estoppel*

Movants contend that the trustee is either collaterally or judicially estopped from claiming, as he does in the Application, that no trades actually occurred during Hanover's final week of trading. They maintain that the trustee and SIPC have consistently argued before this court that debtor possesses enforceable claims against all customers whose accounts reflect purchases of House Stocks, even if those buys were unauthorized. They further allege that we have ruled in the trustee's favor on this point, that the trustee has in fact already obtained payment for certain of these unauthorized trades by "net equitying" the accounts of the customers in question even though he now claims that the trades "never happened", and that the trustee has asserted that he holds claims against these customers for any remaining debit balances created in their accounts as a result of the unauthorized purchases.

Specifically, movants argue that in connection with a July 30, 1996 hearing (the "July 30 Hearing") on the trustee's May 2, 1996 motion for an order upholding his determinations concerning losses due to Hanover's unauthorized trading (the "May 2 Motion"), the trustee and SIPC argued that debtor's books and records as of the Filing Date are "immutable" in establishing customer rights and liabilities under SIPA. Movants contend that we adopted the trustee's position in granting that motion and in subsequent decisions. As support, they cite to various excerpts from the transcript of the hearing, our August 27, 1996 order granting the May 2 Motion (the "August 27 Order") and our decision in *In re Adler, Coleman Clearing Corp.*, 198 B.R. 70 (Bankr.S.D.N.Y.1996).

The trustee claims that he has never played "fast and loose" with this court, movants or anyone else, and has always taken the position that the trading activity involving the House Stocks and the Blue Chips is unusual, requires special consideration, and based upon his preliminary investigation and correspondence with former Hanover customers, may have been fraudulent or otherwise illegal. The trustee also denies that his positions on this point have ever been inconsistent, because the facts and the law bearing on this motion differ from those presented by any other matter previously before this court. He asserts that in the context of the May 2 Motion, he argued that it was not appropriate to look beyond debtor's books and records in determining whether allegedly unauthorized trades should be erased from the accounts of Hanover's customers because any losses *to the customers* were the fault of Hanover, the introducing broker, rather than debtor, the clearing firm. According to the trustee, he has previously argued, and we have agreed, that the trustee had no part in a dispute between Hanover and its customers concerning unauthorized trading, and that a clearing broker is not liable for the acts of its introducing broker. *See, e.g., Adler, Coleman,* 198 B.R. at 74 ("[o]utside a SIPA liquidation proceeding, debtor would not be accountable to Favilla or the Rabinowitzes for Stratton Oakmont's and/or Datek's alleged unauthorized trading because debtor is not acting as their agent and does not owe a fiduciary duty to their customers. Those claims are equally unenforceable herein"); Transcript of July 30 Hearing 27 and 30; May 2 Motion p. 8; Transcript of September 13, 1996 Hearing 27–28; Transcript of May 28, 1996 Hearing 30 and 31. The trustee maintains that his Application presents a very different issue, and that he is now objecting to a scheme that was designed *to defraud Adler* —an issue which we have never before been asked to decide. He also asserts that the argument previously made by customers who alleged that they were victimized by Hanover was not that the trades never happened, but that they were unauthorized, and notes that, unlike here, those unauthorized trades settled. The trustee contends that he has never argued that debtor's books and records are conclusive for all purposes, and that, contrary to movants' contention, he has never attempted to shift the losses arising from the allegedly fraudulent trades at issue here to the customers who were booked with fake buys in Hanover's final week.

Collateral estoppel precludes relitigation of an issue previously litigated by the parties in federal court if: (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *See Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997); *Levy v. Kosher Overseers Ass'n of America, Inc.*, 104 F.3d 38, 41 (2d Cir.1997).

There is no question that, as the trustee contends, he has previously argued, and we have ruled herein, that trades reflected in debtor's records must be recognized in determining a customer's rights under SIPA, even though those trades were not authorized, because debtor did not have a fiduciary relationship with Hanover's customers and the Clearing Agreement with Hanover allocated to Hanover the risk of unauthorized trading. However, he has never argued that debtor's books and records are immutable for all purposes. Moreover, the issue before us herein is not whether debtor is liable for unauthorized trades. Movants assert that they authorized the House Stock sales and the Blue Chip purchases. The trustee has rejected their claims for the proceeds of those transactions on the basis that it was part of a scheme to defraud Adler and SIPC. The trustee has not previously litigated that issue and is not collaterally estopped from doing so now.

Judicial estoppel precludes a party from taking a factual position during the course of litigation that is contrary to one previously asserted by that party in a prior legal proceeding. *Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1037 (2d Cir.1993), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). It protects "the sanctity of the oath and the integrity of the judicial process ... by avoiding the risk of inconsistent results in two proceedings." *Id.* (citing Rand B. Boyers, Comment, Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel, 80 Nw.U.L.Rev. 1244, 1250–58 (Spring 1986)); *see also Rosenshein v. Kle-*ban, 918 F.Supp. 98, 104 (S.D.N.Y.1996) ("Judicial estoppel is invoked ... to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process"); *Official Creditors' Comm. v. MacMillan (In re Maxwell Newspapers, Inc.)*, 189 B.R. 282, 289 (Bankr. S.D.N.Y.1995) ("Judicial estoppel prevents a party who benefits from the assertion of a certain position from subsequently adopting a contrary one").

The two elements of judicial estoppel are that (i) the party sought to be estopped must have argued an inconsistent position in a prior proceeding, and (ii) the prior inconsistent position must have been adopted by the court in some manner. *Bates*, 997 F.2d at 1037; *see also AXA Marine & Aviation Ins. (UK) Limited v. Seajet Indus., Inc.*, 84 F.3d 622, 628 (2d Cir.1996) (citing two part test with approval). We have already concluded that the trustee has not taken a position in this case at odds with the one he now advocates in the Complaint. He has consistently maintained throughout these proceedings that the House Stock/Blue Chip trading effected during the final week of Hanover's existence is suspect and requires exacting scrutiny. In connection with the May 2 Motion, the trustee argued that he need not look beyond debtor's books and records; but not because they are "immutable" for purposes of SIPA. Rather, Hanover's, as opposed to debtor's, liability for unauthorized trades under the Clearing Agreement and applicable law made additional inquiry unnecessary. The trustee also never previously argued that Hanover's trading was fictitious. Finally, contrary to movants' assertions, the trustee has never attempted to shift the losses arising from the allegedly fraudulent transactions involving the House Stocks and the Blue Chips to the parties who were booked with fake "buys" in the last week. He has never received payment for any of the fake "buys", nor has he made a claim for payment against the customers involved or "net equitied" any customer account to offset any claims he may have. The doctrine of judicial estoppel does not bar the Complaint.

## SIPC Rules

Movants contend that the Application fails to state a claim upon which relief can be granted because (i) the final week trades are reflected in debtor's books and records, and (ii) they are entitled to the proceeds of the Blue Chips as a matter of law under SIPA § 78fff–2 and the SIPC Series 500 Rules. The SEC promulgated the SIPC Rules in 1988 and they have the force and effect of law. *See In re Adler, Coleman Clearing Corp.*, 195 B.R. 266, 275 (Bankr.S.D.N.Y. 1996). SIPA § 78fff–2 is entitled "Payments to customers", and provides in relevant part as follows:

> After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of subsection (d) of this section and section 78fff–3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date.
>
> \* \* \*
>
> Any payment or delivery of property pursuant to this subsection may be conditioned upon the trustee requiring claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases, and assignments, but shall be without prejudice to any right of a claimant to file formal proof of claim within the period specified in subsection (a)(3) of this section for any balance of securities or cash to which such claimant considers himself entitled.

15 U.S.C. § 78fff–2. Movants argue that they are entitled to the proceeds of the Blue Chips as a matter of law because the final week trades "are ascertainable from the books and records of the debtor" as of the Filing Date. They contend that the Series 500 Rules, which determine whether a customer has a "claim for cash" or a "claim for securities", mandate the same conclusion. Rule 300.501 provides in relevant part that

> (a) Where a SIPC member ("Debtor") held securities in an account for a customer, the customer has a "claim for cash" with respect to any authorized securities sale:
>
> (1) If the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or
>
> (2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

17 C.F.R. § 300.501. Rule 300.502 provides in pertinent part that

> (a) Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:
>
> (1) If the Debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or
>
> (2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of completed or executory contract for sale for or purchase from the account.

17 C.F.R. § 300.502.

Movants assert that the Series 500 Rules create a "bright-line" test conclusively establishing their right to the return of the cash and securities in their accounts as evidenced in debtor's books and records, because each of them have satisfied the "executory contract prong" of the Series 500 Rules with respect to the sale of their House Stocks and the purchase of the Blue Chips. They rely on the express language of the Rules, the purpose for which they were enacted and the cases *Murray v. McGraw (In re Bell & Beckwith)*, 821 F.2d 333 (6th Cir.1987), and *In re Investors Center, Inc.*, 129 B.R. 339 (Bankr.E.D.N.Y.1991).

In *Bell & Beckwith,* certain customers instructed their debtor-broker to sell 3,500 shares of stock. The broker did so by arranging to sell 1,900 shares to other brokers (for their own accounts rather than on behalf of customers) and committing to buy the remaining 1,600 shares for its own account. All of those trades were reflected on trade tickets and confirmed to the customers. However, the debtor filed for bankruptcy prior to settlement of the trades. 821 F.2d at 334. The bankruptcy trustee "cancelled" the transactions insofar as they involved the broker-purchasers, retained all 3,500 shares in the estate and credited the customers' account for the proceeds of the sale. However, in part because the value of the stock had increased, the customers wanted their claims to be characterized as claims for stock rather than cash. *Id.* at 335.

Because the SIPC Series 500 Rules were not issued until 1988, SIPA provided no clear solution for a situation involving customer trades straddling the filing date. After discussing analogous SIPC Rules governing unsettled transactions between brokers, the legislative history of SIPA, applicable law regarding agency and executory contracts and Article 8 of the Uniform Commercial Code, which governs securities transactions, the court concluded that the trustee's initial determination was correct:

> We hold that, under SIPA, all trades ordered by customers of a debtor before the filing date should be treated, vis-a-vis those customers, as if subsequently completed by the trustee. Those customers who ordered stocks held for them by the debtor to be sold before the filing date have a claim against the estate for the purchase price, not for stock, without regard to whether a "settlement date" postdating the filing date was arranged.

*Id.* at 340. In *Investors Center,* the debtor was a broker-dealer of, and market maker in, low priced penny stocks traded in the over the counter market. After the NASD directed the debtor to discontinue self-clearing its transactions due to its failure to meet minimum net capital requirements, the debtor purported to transfer virtually all of its customer accounts to a clearing broker. Between the time of the transfer and the date that the debtor closed its doors, the debtor improved its position at the expense of its customers by claiming that it received purchase orders from customers who denied submitting them and by failing to execute sell orders. 129 B.R. at 345. Customers who "sold" their securities to the debtor received written confirmation of the sales from the debtor's clearing firm. However, the debtor, apparently realizing that it could not pay for the securities it purchased, sent (or directed its clearing firm to send) those customers a second "confirmation" purporting to cancel the sales. *Id.* at 349.

The SIPA trustee determined that each claimant only had a "claim for securities" rather than a "claim for cash" because (i) the sale, if recognized, would constitute a fraudulent transaction, (ii) the court would not order reversal of the cancellations by the debtor and thereby force SIPA to advance funds to the trustee to pay the customers for alleged sales to the debtor, since the debtor was not able to pay for the purchases it made and transmitted "confirmations" purporting to cancel the trades, and (iii) the transfer of the accounts to the debtor's clearing broker constituted satisfaction of their claims. *Id.* The trustee did not press his claim that the trades should not be honored because they were fraudulent conveyances. The court rejected his remaining claims:

> [U]nder the SIPC Rules ... and under general principles of contract law it makes no difference when the so-called "cancellation notices" were generated or mailed. They could not wipe out the legal effect of the written confirmation of sale sent earlier. They were unilateral notices that Investors Center was breaching the sale it had earlier confirmed. But under SIPC's rules it is not performance that is critical, but receipt of written confirmation of sale. This is clear from the Rules themselves. The customer has a claim for cash in either one of two circumstances. The customer has a claim if the securities in question "have become the subject of a completed or executory contract for sale...." Rule 501(a)(2). If that were all the Rule said, the cancellation notice might have been fatal to the claims of these customers. But

under the Rules the customer also has a claim when the customer has been sent "written confirmation" of a sale. (Rule 501(a)(1)). If the Trustee were correct, the customer would have a claim for cash only where the securities in question had "become the subject of a completed ... contract for sale" whereas the Rules attach equal finality to the receipt of a "written confirmation ... that the securities in question have been sold." To require the sale actually to be completed, even though confirmation had been sent, is to read Rule 300.501(a)(1) out of the statute. But as the Rules make clear, not both requirements, *i.e.*, confirmation and execution, need be met, only one.

In this case the customers received written confirmation. Therefore, they have a claim for cash regardless of the fact that the contract was never executed because of Investors Center's breach. It makes no difference why Investors Center breached the contract. Thus, it is irrelevant that the cancellation which the Trustee elects elsewhere to denominate the "second confirmation" was issued "because the Debtor had no cash to complete the purchase of such securities on February 22, 1989." ... The insolvency of Investors Center, the very condition SIPA was enacted to deal with, certainly cannot serve as an excuse for denying a customer less than that to which he is entitled under the Act and its implementing Rules.

SIPC argues that the Trustee "is not free to recognize the confirmation of the sale and simply ignore the second confirmation which cancelled it" ... This suggests a false symmetry. The so-called "second confirmation" confirmed nothing. No customer had requested the cancellation of the sale of his stock nor consented to it. To call it a confirmation is to play with words and to try thereby to fit a cancellation notice into the SIPC rules where it has no place.

As SIPC has consistently stressed during the course of these proceedings, we are dealing with rights under a specific statute as implemented by specific rules. To quote Stephen P. Harbeck, Senior Associate General Counsel for the Securities Investor Protection Corporation, the Rules were intended to "provide a bright line Rule for future litigants and future claimants as to when a claimant was entitled to cash and when a claim [sic] is entitled to securities." (Tr. 11/14/90, p. 21) Under that "bright line" rule, once a customer has received a "written confirmation" of sale, as each of these customers did, he has a claim for cash.

The issue here, as the Trustee has consistently argued, is not what the obligations of Investors Center are to its customers under contract, or common law, but what rights, if any, those customers have under a very specific and narrow statute to reimbursement from a particular fund. That the notice of cancellation constituted a breach of contract is immaterial to their statutory rights. The Trustee attempts to turn around the principle that SIPA does not protect against breach of contract and contends that because the so-called cancellation gave rise to a claim for breach of contract that the customer can claim nothing under the Securities Investor Protection Act. This is a logical fallacy. It is true that a customer who has nothing but a breach of contract claim cannot recover under SIPA, but it does not follow from the fact that a customer who has a recognizable claim under SIPA may also have a claim for a breach of contract that he cannot recover for the former. One does not nullify the other. The customers here involved all have claims under the Securities Investors Protection Act because each one received written confirmation of a sale. That they may, or may not, also have claims for breach of contract against Investors Center, claims which, as everyone recognizes are valueless, does not deprive them of their rights against the Fund created by SIPA.

*Id.* at 349–51. *Bell & Beckwith* and *Investors Center* are instructive in illustrating the history, purpose and application of the SIPC Series 500 Rules, but they do not mandate that we dismiss the Complaint. Neither *Bell & Beckwith* nor *Investors Center* involved allegations of fraud and illegality like those alleged by the trustee in the Complaint.

Further, those courts did not consider the effect of SIPC Rule 300.503, or in the case of *Bell & Beckwith,* any comparable rule of law pre-existing its issuance, which clearly creates an exception to the "bright-line" rule.

Movants contend that once they have satisfied the "bright-line" test establishing a customer claim, the trustee's exclusive bases for avoiding the final week trades arise under 544, 545, 547 and 548 of the Bankruptcy Code. As noted, the Complaint adequately alleges grounds for finding that the "bright-line" test is not applicable. However, assuming, *arguendo,* that movants could satisfy that test, we find no merit to their argument.[4]

■ As support for their assertion that the trustee cannot simply "cancel" or "rescind" the trades after they have satisfied the requirements of 17 C.F.R. §§ 300.501 or 502, movants rely upon SIPA § 78fff–2(c)(3), *Bell & Beckwith* and *Investors Center.* They also cite parenthetically to SIPA § 78fff–1[5] and Rule 300.503(a), but without discussing the latter and its impact on the trustee's claims in any way. SIPA § 78fff–2(c)(3) provides in pertinent part that

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11 . . . .

15 U.S.C. § 78fff–2(c)(3). Movants' attempt to limit the trustee's ability to avoid transactions otherwise meeting the requirement of the Series 500 Rules is not supported by SIPA or the SIPC Rules. Pursuant to

§ 544(b) of the Bankruptcy Code, the trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowed] unsecured claim" against debtor. 11 U.S.C. § 544(b); *see also* 15 U.S.C. § 78fff(b) (making chapters 1, 3 and 5, and subchapters I and II of chapter 7 of title 11 applicable in SIPA proceedings). Thus, because the Bankruptcy Code avoidance sections clearly incorporate other applicable law, the trustee may avoid, "rescind" or "cancel" the alleged trades pursuant to any applicable law, including, but not limited to, SIPA, the Bankruptcy Code, and New York's Debtor and Creditor Law, N.Y. Debt. & Cred. Law §§ 270 to 281 (McKinney 1990). *See In re Harvard Knitwear, Inc.,* 193 B.R. 389, 392 (Bankr. E.D.N.Y.1996) (Section 544(b) permits trustee to avoid transfers that are voidable under state law, including fraud provisions of Uniform Fraudulent Conveyance Act, as adopted in § 273 of the New York Debtor and Creditor Law). *Bell & Beckwith* and *Investors Center* do not hold otherwise. As noted previously, neither involved the allegations of fraud present in this case. Moreover, *Bell & Beckwith* predates the issuance of SIPC Rule 300.503. Movants' assertion that a SIPC trustee is powerless to contest a claim that is unenforceable against the debtor merely because the challenge does not fall within the traditional "avoidance" powers of a bankruptcy trustee is untenable. We reject it as an unduly restrictive construction of SIPA and the SIPC rules.

Movants also argue that because SIPC Rule 300.503 does not create, but only preserves, whatever avoidance powers a trustee has under the Bankruptcy Code, we must dismiss the trustee's claims seeking rescis-

---

4. Among the trustee's responses to that argument is that for the movants to prove an executory contract for securities, they must comply with New York's Uniform Commercial Code, which governs the enforcement of securities contracts. *See generally,* N.Y.U.C.C. Art. 8 (McKinney 1990). He also contends that the Statute of Fraud governs the trades. *See* N.Y.U.C.C. § 8–319. He maintains that movants cannot satisfy any part of § 8–319 and, as such, all trades for which movants lack confirmations do not satisfy the Statute of Frauds and are unenforceable. Thus, he has cross-moved for summary judgment upholding

his determination respecting the claims of those customers who did not receive confirmation of their alleged trades. We will not address that argument herein. Rather, we will resolve it in a separate memorandum decision.

5. That section provides that ("[a] [SIPA] trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under title 11 of the United States Code"). 15 U.S.C. § 78fff–1.

sion or cancellation of the final week trades presumably because those remedies are not among a bankruptcy trustee's avoidance powers. Whether characterized as "rescission" or "cancellation" of a contract, or "avoidance" of transfers made or obligations incurred thereunder, a remedy which does not give effect to the terms of an illegal or fraudulent contract is clearly available to the trustee under the Bankruptcy Code, and by its terms, Rule 300.303. We find that the adequately pleads a cause of action for avoidance, recission or cancellation of the final week trades on the basis that they were part of a scheme to defraud Adler and the SIPC. As such, movant's Rule 12(b)(6) motion fails on this point as well.

### *The Stockbroker Exception*

■ Movants argue that because the proceeds of their House Stock sales represent "settlement payments" and "margin payments" under § 546(e) of the Bankruptcy Code, the trustee may only seek to avoid the trades as intentionally fraudulent transactions under § 548(a)(1) of the Bankruptcy Code, and the Complaint fails to state any such claim against them.

Section 546(e) provides that

Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

11 U.S.C. § 546(e).

Pursuant to § 741(5) of the Bankruptcy Code, a "margin payment" is a "payment or deposit of cash, a security or other property, that is commonly known in the securities trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, or variation payments". Section 741(8) defines a "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Although those Bankruptcy Code provisions do not apply in SIPA cases because they are contained in subchapter III of chapter 7 of the Bankruptcy Code, *see* 15 U.S.C. § 78fff(b), the definitions are substantially identical to those contained in §§ 101(38) and (51A) of the Bankruptcy Code (defining margin and settlement payments in context of forward contracts). The term "settlement" has been defined as "the conclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of the sale." *Biggs v. Smith Barney, Inc. (In re David)*, 193 B.R. 935, 940 (Bankr.C.D.Cal.1996) (citing *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1238 (10th Cir.1991), *cert. denied*, 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992)).

Section 546(e) "minimizes the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583; *see also Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 352 (N.D.Tex.1996) (same); *Jonas v. Farmer Bros. Co. (In re Comark)*, 124 B.R. 806, 817 (Bankr.C.D.Cal.1991) ("[b]y enacting Section 546(e), in 1982, Congress sought to protect the entire securities market"), *aff'd*, 145 B.R. 47 (9th Cir. BAP 1992).

The Third, Ninth and Tenth Circuits construe the term "settlement payments" broadly. *See Bevill, Bresler & Schulman v. Spencer Sav. & Loan*, 878 F.2d 742, 745 (3rd Cir.1989) (prepetition transfers of federal government securities repurchase agreements by securities dealer to purchasers constitutes unavoidable "settlement payments"); *Kaiser Steel*, 952 F.2d at 1230, 1239–41 (consideration paid to shareholders for their stock in connection with a leveraged buyout constitutes unavoidable "settlement payments"); *Comark*, 971 F.2d at 324 (debtor's

return of government securities that had served as additional margin in repo transaction between debtor and other party, upon cancellation of transaction, constitutes unavoidable "settlement payments"). Apparently, our court of appeals has not addressed § 546(e) in this or any other context. The trustee correctly contends that because movants must accept as true for purposes of this motion his allegation that there were no payments of any kind but only fictitious bookkeeping entries, there could be no "settlement" or "margin" payments no matter how broadly one defines those terms. Contrary to movants' assertion, and as previously stated, trustee is not estopped from making that argument.

In any event, as the trustee argues, even if § 546(e) applies, the Application adequately pleads a cause of action for intentional fraud under § 548(a)(1) of the Bankruptcy Code. That provision states that

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor ... if the debtor voluntarily or involuntarily ... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred, indebted....

11 U.S.C. § 548(a)(1). Under § 550(a),

> to the extent that a transfer is avoided under section ... 548 ... of [title 11], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of the property, from—
>
> (1) the initial transferee of the transfer or the entity for whose benefit such transfer was made....

11 U.S.C. § 550(a).

Movants argue that the Complaint fails to state a claim for actual fraud because it does not allege that debtor or movants committed actual fraud, but that Hanover defrauded debtor and the SIPC. They acknowledge that according to the trustee, Hanover fraudulently attempted to transfer the proceeds of the final week trades—cash and Blue Chips—out of the estate to movants, and as

such, that we can impute Hanover's fraudulent intent to debtor because Hanover dominated or controlled the disposition of Adler's property. However, movants urge us to reject that argument because they were the transferees of the final week trades, not Hanover. They also contend that the Complaint not only fails to allege that they committed fraud, but that the trustee admits that they did not do anything illegal.

■ The trustee contends, and movants do not dispute, that the Hanover brokers, who allegedly possessed the fraudulent intent and who caused the transfers at issue herein, were the beneficiaries of the alleged scheme. Moreover, although § 548(a)(1) speaks of the debtor's "actual intent to hinder, delay or defraud" creditors, that intent may be imputed to a transferee or obligee where it is in a position to dominate or control the debtor's disposition of property. *See Hunter v. Society Bank & Trust (In re Parker Steel Co.),* 149 B.R. 834, 855 (Bankr.N.D.Ohio 1992) (where debtor corporation had actual intent to defraud creditors when transfers made by debtor on bank credit line and note personally guaranteed by principal who directed payments, fraudulent intent imputed to principal); *European Amer. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.),* 158 B.R. 926, 938 (Bankr.S.D.N.Y. 1993) (debtor sufficiently stated cause of action for fraudulent conveyance under § 548(a)(1) and § 276 of the New York Debtor and Creditor Law when it alleged that collateral foreclosed on by mortgagee was not sold for fair market value); *Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats, Inc.),* 144 B.R. 451, 459 (Bankr. D.N.D.1992) (noting however that the situation normally arises where the transferee is debtor's sole or dominant shareholder and that "[t]he cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee"); *In re Vaniman International, Inc.,* 22 B.R. 166, 184 (Bankr. E.D.N.Y.1982) (fraudulent intent found "where a transferee in a position to dominate or control the debtor's position of its property has arranged for the corporation to incur an obligation many times greater than and

benefit received, the result of which was the corporation's insolvency"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1] at 548–22 (15th ed. rev.1997) (citing cases).

Thus, to state a cause of action under § 548(a)(1), the Complaint must allege (i) that Hanover intended to defraud Adler's creditors or SIPC, (ii) that Hanover dominated or controlled Adler's disposition of its property, and (iii) that movants can be held responsible under applicable law for Hanover's fraudulent acts as the ultimate beneficiaries of the final week trades. It satisfies each of those conditions.

The trustee alleges that Hanover intended to defraud Adler's creditors and SIPC and that Hanover controlled the disposition of debtor's property. *See* Complaint ¶¶ 27–72 (describing in detail Hanover's scheme to defraud Adler and SIPC); ¶ 73 (alleging that Hanover was able to control disposition of debtor's property). Movants contend that neither they nor Hanover was an insider of debtor and that it cannot be seriously asserted that either had the power of total domination and control. We are not prepared to conclude at the pleading stage of this proceeding that the extent of Hanover's control over debtor's processing of trades, which was in large part automatic upon Hanover's submission of same, was insufficient to satisfy the requirements of the intent imputation doctrine.

The trustee contends that the Hanover brokers who carried out the scheme to defraud Adler were acting as movants' agents and that Hanover's fraud can therefore be imputed to them. He also asserts that contrary to movants' statements, he has not admitted that movants were innocent and ignorant of any fraudulent activity at Hanover, but that he simply has not made any allegations of wrongdoing because he is not presently aware of any.

A "broker" "is in the business of effecting transactions in securities for the account of others". Securities Exchange Act § 3(a)(4), 15 U.S.C. § 78c(a)(4). Brokers are, "in short, agents who place orders for principals, their Customers." *Board of Trade of the City of Chicago and Chicago Mercantile Exchange v. Securities and Exchange Commis-*

*sion,* 923 F.2d 1270, 1273 (7th Cir.1991); *accord Securities Indus. Ass'n v. Board of Governors of the Federal Reserve Sys.,* 468 U.S. 207, 218, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984) ("a broker executes orders for the purchase or sale of securities solely as Agent"); *Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 510 (2d Cir.1994) ("[t]he relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature, according to New York law"); *Shahzad v. H.J. Meyers & Co., Inc.,* No. 95 Civ. 6196(DAB), 1997 WL 47817, *11 (S.D.N.Y. Feb. 6, 1997) ("[i]n New York, '[t]he relationship between a stock broker and its customer is that of principal and agent and is fiduciary in nature'") (citing *Conway,* 16 F.3d at 510); *Jaksich v. Thomson McKinnon Securities, Inc.,* 582 F.Supp. 485, 502 (S.D.N.Y.1984) ("[u]nder New York law, brokers maintain fiduciary duties to their customers, and the relationship between the two parties is one of principal and agent") (citing *Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 946 (S.D.N.Y.1979); *Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 93 Misc.2d 941, 944, 404 N.Y.S.2d 258 (1978)). However, "[t]he relationship of agent and principal only exist[s] ... when an order to buy or sell [is] placed, and terminate[s] when the transaction [is] complete." *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd,* 453 F.2d 417 (5th Cir.1972).

Movants contend that Hanover did not act within the very limited scope of its agency when it perpetrated the alleged fraud upon Adler. According to them, Hanover acted as principal for its own account when it submitted the unauthorized buys to Adler, not as their agent, and they had nothing to do with those transactions. However, as the trustee contends, a broker can act in a dual capacity as dealer-principal for its own account and also as a broker on its customer's behalf. *In re Merrill Lynch Secs. Litig.,* 911 F.Supp. 754, 760 (D.N.J.1995)., *rev'd on other grounds,* 135 F.3d 266 (3d Cir.1998); *Gammage v. Roberts, Scott & Co.,* No. 71–480–T, 1974 WL 437 at *8 (S.D.Cal. June 13, 1974). That is what he alleges happened here. He claims that the individual brokers and Hano-

ver acted as movants' agent when entering the fake trades into Adler's computer system—when the fraud allegedly occurred—and as their agent when Hanover purported to buy Blue Chips. As a general rule, "[a] principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent, even though he had no knowledge thereof and intended no fraud". *See* 3 N.Y.Jur.2d AGENCY § 256 (1980) (footnotes omitted). As the Trustee contends, here movants were the principals and Hanover was their agent.

Movants also contend that their purchases of Blue Chips are not even implicated in the alleged fraud, because there is no allegation in the Complaint that the price of the Blue Chips was manipulated or that Adler could not have received payment from movants for those purchases. To the contrary, they assert, Adler's books and records reflect that the Blue Chips were paid for from the proceeds of the sale of their House Stocks. They maintain that the only allegation in the Complaint against them is that they sought to avoid exposure to the $100,000 SIPA insurance limitation for cash in their accounts by using that cash to purchase stocks in order to gain greater protection, and that this is simply not fraud. Movants would have us view the trading activity that transpired in the final week of Hanover's existence piecemeal rather than, as the trustee alleges in the Complaint, a comprehensive scheme intended by Hanover to benefit movants at the expense of debtor and SIPC by dumping movants' soon to be worthless House Stocks and converting the cash credits generated thereby into Blue Chip stocks. We decline to apply such a mechanistic approach to the anti-fraud provisions of the Bankruptcy Code, particularly at the pleading stage of this proceeding.

■ Finally, movants argue that they never ratified Hanover's fraudulent acts, since Hanover was neither acting nor purporting to act as movants' agent when it allegedly defrauded Adler. As already noted, Hanover could, and allegedly was, acting in a dual capacity as to the relevant transactions. Moreover, by seeking to accept the benefits of those transactions, movants have ratified Hanover's allegedly fraudulent acts. *See* Restatement (Second) of Agency §§ 84, 97, 98.

The trustee also contends that the final week trades can be avoided regardless of any fraudulent intent on movants' part. As support, he cites to two unreported cases decided in the infancy of SIPA, *SEC v. S.J. Salmon & Co.*, 72 Civ. 560, slip op. (S.D.N.Y. Aug. 8, 1973) ("*Salmon 1*"), and *SEC v. S.J. Salmon & Co.*, 72 Civ. 560 slip op. (S.D.N.Y. Feb. 5, 1974) ("*Salmon 2*"). In *Salmon 1*, the debtor, a market maker in penny stocks, was being investigated by the NASD because it was facing a severe net capital deficiency. Knowing that "the liquidation of its business was both inevitable and imminent and that the quoted values of [its house stocks] would dip sharply with its withdrawal as a market maker for those securities," the debtor purported to sell its customers' house stocks and to put the customers into cash credit balances so that their cash claims would be paid with advances to be made by SIPC. *Salmon 1* at 9–10. Specifically, on the final day the debtor conducted business, nine of its customers sold some 43,150 shares of their house stocks to the firm's proprietary account. Two days prior to the sales, the NASD had advised the debtor's principals that there were no buyers in the market for the shares at the prevailing market price and that, as a consequence, the firm's capital position was illiquid. *Id.* at 6–8. According to the court, there was "no room for doubting that the ... transactions were intended by the debtor to place favored customers in a position so that instead of finding themselves possessed of securities that would shortly be severely depressed in value, they would appear to have cash credit balances at preliquidation prices." *Id.* at 14. The court concluded that it was "a deliberate attempt to defraud SIPC, and that the trades were made with actual intent to hinder, delay or defraud existing creditors or future creditors" within the meaning of 67d(2)(d) of the former Bankruptcy Act. *Id.* at 13–14. It also found the trades to be constructively fraudulent under §§ 67(d)(2)(a), (b) and (c) of the former Bankruptcy Act. *Id.* at 21–24. The bankruptcy judge reaffirmed his conclu-

sions to that effect in *Salmon 2*. *Salmon 2* at 11.

Movants attempt to distinguish the *Salmon* cases on the basis that they were decided (i) in SIPA's infancy, (ii) prior to the issuance of the Series 500 Rules, and (iii) prior to the enactment of §§ 548 and 546(e) of the Bankruptcy Code, as well as the issuance of *Bell & Beckwith* and *Investors Center*. Movants argue that because those statutes, rules and decisions set forth the clear policy of SIPA to promote objective certainty with regard to pre-petition transactions and to limit their avoidance to cases of intentional fraud, the *Salmon* holdings have been "legislatively and judicially eviscerated."

The *Salmon* court found the transactions in question were intentionally as well as constructively fraudulent. *See Salmon # 1* at 13–14; *Salmon # 2* at 11. The statute under which it found actual intent to defraud, § 67d(2)(d) of the former Bankruptcy Act, is for all intents and purposes indistinguishable from § 548(a)(1) of the Bankruptcy Code.[6] *See Estate of Klein v. Klein (In re Klein)*, No. 86 B 19937, 1991 WL 242169, at *8 (Bankr.N.D.Ill. June 21, 1991) ("[t]he language [of § 548(a)(1)] is derived primarily from former Section 67 of the Bankruptcy Act of 1898 and thus the cases decided under § 67 of the Act demonstrate the proper application of § 548(a)(1)"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.LH [1] at 548–88 (15th ed. rev.1997) (discussing history of § 548(a)(1) ranging as far back as the Statute of Elizabeth, 13 Eliz., ch. 5 (1571)). As such, the *Salmon* decisions are entirely consistent with the Series 500 Rules, §§ 546(e) and 548 of the Bankruptcy Code, SIPA and subsequent decisions construing these rules and statutes.

### The Trustee's Non–Bankruptcy Avoidance Theories

Movants contend that even if the trustee can assert claims under non-bankruptcy avoidance theories, the Complaint fails as a matter of law because (i) the Clearing Agreement does not authorize debtor to "cancel" the final week trades; (ii) the allegedly "fraudulent" and "illegal" contracts were the unauthorized buys that Hanover submitted, not movants' final week trades, and (iii) there is no allegation in the Complaint that movants committed any fraud, engaged in any illegal act or possessed any "guilty knowledge" in connection with the final week trades.

As noted, section 3(b) of the Clearing Agreement provides that

Notwithstanding anything contained in Paragraph 3(a) to the contrary, [Adler] may, [if it has reasonable grounds to believe] such action is necessary to protect its interests, refuse to open an account for a specific customer; close an account already opened; refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash, securities or other property; refuse to clear any transaction executed by [Hanover]; or refuse to execute any transaction for an Introduced Account (notwithstanding its acceptance by the Introducing Firm pursuant to Paragraph 5(d)). [Adler] shall use its best efforts to notify [Hanover] of any such action in advance thereof if it is able to do so without jeopardizing its economic interests. . . .

Clearing Agreement ¶ 3(b) (all bracketed material in original except for names). Movants contend that this provision exists to protect debtor in the period between accepting the executed trade and the settlement date, and does not create an indefinite period and unilateral right to rescind executed trades subsequent to an insolvency proceeding under SIPA. They argue that if we read the Clearing Agreement to give the trustee the ability to cancel executed trades, we will violate the "bright-line" test enunciated in *Investors Center*, 129 B.R. at 350, and directly contra-

---

6. That section provided as follows:

> (2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent
> * * *
> (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.

11 U.S.C. § 67d(2) (repealed 1979).

dict SIPA and the Series 500 Rules. However, as the trustee points out, *Investors Center* did not discuss the issue of whether a clearing firm's right to cancel trades must be exercised in the period prior to the settlement date. Moreover, none of the trades settled and the trustee never released the accounts involving the trades. Indeed, the movants have never had access to their accounts and have been on notice since the commencement of this case that the trustee perceived that there were problems with the trades. Thus, we find no merit to movants' assertion.

Likewise, we find no merit to movants' assertion that the fake "buys" are distinguishable from their "sells". That raises a factual issue that cannot be resolved in this motion. In any event, the trustee has alleged that the fake "buys" and "sells" were part of a single scheme to defraud Adler and SIPC.

Finally, we have already determined that the Complaint adequately pleads that movants are responsible for Hanover's acts on the basis of agency principles. Movants contend that when they sold the House Stocks to Hanover (having delivered them through Adler), Hanover was the obligor (undertaking to pay the agreed price), movants were the obligees and Adler was the guarantor. Further, they assert that when they purchased the Blue Chip stocks, they became obligated to deliver the price, which Adler guaranteed to deliver to the seller. As support, they cite the Clearing Agreement, a law review article (the "Article") co-authored by Michael E. Don, the current President of SIPC, and New York's suretyship law.

In relevant part, the Article states that

In the course of completion of the trade, certain guarantees are issued. The seller's broker, who is a member of a clearing agency obligates itself to deliver the securities to the clearing agency in exchange for payment. By the same token, the buyer's broker guarantees to the clearing agency to make payment upon delivery. In turn, the clearing agency stands behind the guarantees issued to it, thus, it guarantees delivery to the buyer's broker and payment to the seller's broker ... If the seller fails to make delivery, its broker and the clearing agency must still complete the trade.

Michael E. Don and Josephine Wong, *Stockbroker Liquidation Under the SIPA and Their Impact on Securities Transactions,* 12 Cardozo L .Rev. 509, 551 (1990). From that, movants initially contended that under New York suretyship law, Adler cannot avoid liability under its "clearinghouse guaranty." The Article describes the obligations that a clearing firm has under a clearinghouse guarantee. However, during argument, the movants conceded that there is no clearinghouse liability at issue in this case. Still, movants dispute trustee's assertion that the Clearing Agreement did not create an obligation on his part to clear trades or guarantee them for Hanover's benefit, and contend that Adler, as a clearing broker, guaranteed movants' trades. As support they cite to portions of the text of certain statements which were part of the July 23 and September 17, 1981 Hearings before the Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary, House of Representatives, 97th Congress, First Session, on Bankruptcy of Commodities and Securities Brokers (the "Legislative History"). *See* October 3, 1997 Letter of Jed Horwitt (the "Horwitt Letter") at 1 (and attachments thereto).

The Legislative History does not have the force of law. As the trustee contends, neither the Horwitt Letter nor the Legislative History identifies particular legislation to which the Legislative History relates, and movants do not contend that there is any legislation that imposes on Adler or any clearing firm a guarantee obligation that does not exist as a matter of private contract. *See* October 14, 1997 Letter of Thomas J. Maloney. We do not read the Legislative History to support movants' contention. The first portion that Horwitt cites consists of testimony by then SEC Commissioner Longstreth, while the second portion is the testimony of Jack Nelson, then NSCC President. *See* Horwitt Letter at 1–3. We read their testimony to describe a clearing house agreement, not an agreement from a clearing broker to an introducing broker, or its customer.

Finally, the deposition testimony of Adler officers Charles Sanicore and Nicholas J. Piazza that movants cite in the Horwitt Letter is not to the contrary.

The Clearing Agreement is unambiguous. Rather than providing that Adler guarantees all trades executed for accounts introduced by Hanover, it gives Adler the right, among other things, to "refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash securities or other property; [or] refuse to clear any transaction executed by [Hanover]." Clearing Agreement ¶ 3(b). Moreover, the agreement specifically provides that "[Adler] shall have no liability to an Introduced Account for any loss suffered by them." *Id.* ¶ 13. Thus, we find no merit to movants' assertion that Adler guaranteed their trades.

### Conclusion

We deny the motion.

SETTLE ORDER.